UNITED STATES of America ex rel. Jack J. GRYNBERG, Plaintiff,

v.

PRAXAIR, INC. & NIELSON & ASSOCIATES, INC., Defendants.

No. 98–CV–16.

United States District Court, D. Colorado.

March 28, 2001.

Michael S. Porter, Michael S. Porter Law Firm, Wheat Ridge, CO, for Jack J. Grynberg.

Michael Noone, Michael L. Beatty & Associates, PC, Denver, CO, Mark D. Colley, Craig Alan Holman, Holland & Knight LLP, Washington, DC, Michael Lance

Beatty, Michael L. Beatty & Associates, PC, Denver, CO, for Praxair, Inc.

Kerry N. Jardine, Burg, Simpson, Eldredge, Hersh & Jardine, P.C., Englewood, CO, Chris Dull Edwards, Simpson, Kepler & Edwards, LC, Cody, WY, for Nielson & Associates, Inc.

Stephen D. Taylor, U.S. Attorney's Office, Denver, CO, for USA.

## ORDER

DANIEL, District Judge.

THIS MATTER is before the Court on Defendant Nielson & Associates, Inc.'s Motion for Summary Judgment filed April 6, 2000, and Defendant Praxair, Inc.'s Motion for Summary Judgment filed April 6, 2000. A hearing on these motions was held March 2, 2001; at that time, I took the motions under advisement. After extensive review of the record,[1] applicable law, and argument of the parties, I find that the motions should be GRANTED.

## *FINDINGS OF FACT*

### Procedural Background

1. Plaintiff Jack J. Grynberg ("Grynberg") commenced this action on January 7, 1998, as a qui tam relator under the U.S. False Claims Act (31 U.S.C. § 3729, et seq., "FCA" or "Act"). Grynberg alleges that Defendant Praxair, Inc. ("Praxair") and Nielson Associates, Inc. ("Nielson") are liable under the so-called "reverse false claim" provision at 31 U.S.C.

§ 3729(a)(7), for having made or caused to be made false records or statements for the purpose of decreasing royalty payments due under certain Federal leases.

2. Grynberg's initial Complaint, filed January 7, 1998, alleged that Praxair and Nielson had "knowingly...underreported, or caused others to underreport, the value of the natural $CO_2$ gas produced from" various Federal leases in the McCallum field in Northern Colorado. (Complaint ¶ 1.)

3. In an Amended Complaint filed October 23, 1998, Grynberg modified his allegations regarding gas undervaluing practices and added allegations that gas volume was underreported. (Amended Complaint, ¶¶ 1, 10, 17–20, 22–25.)

4. Pursuant to the Act, Grynberg's Complaint was filed under seal and remained sealed until December 1998, when the U.S. Department of Justice advised the Court that the Government would not intervene. *See* 31 U.S.C. § 3730(b)(2). At that time, the seal was lifted and the Amended Complaint was served on the defendants.[2]

5. After this Court denied Motions to Dismiss filed by both Praxair and Nielson, the parties engaged in lengthy discovery proceedings. Thereafter, on March 2, 2001, the Court heard oral argument on summary judgment motions filed by both Praxair and Nielson. Exhaustive briefs

1. Citations to evidence presented at the oral argument or in prior written submissions will be referenced using the following abbreviated citation forms: Praxair's Summary Judgment Hearing Notebook, ("PHN Tab ___, with a cross reference to the corresponding prior motion and/or response"); exhibits that accompanied Praxair's Motion for Summary Judgment ("Praxair Mem. Ex. ___"); exhibits that accompanied Praxair's Reply to Grynberg's Combined Response to the Motion for Summary Judgment ("Praxair Reply Ex. ___"); exhibits that accompanied Grynberg's

Combined Response to Defendants Motions for Summary Judgments, Statement of Additional Disputed Facts and Exhibits ("G'berg Opp. Ex. ___"); exhibits that accompanied Grynberg's Supplemental Brief ("G'berg Supp. Ex. ___"); transcript of March 2, 2001, hearing ("Hearing ___"). Not all record evidence already before the court has been cited, particularly as to issues treated fully in prior fact statements and undisputed matters.

2. The initial Complaint was never served.

and exhibit submissions by all parties have provided the Court with an extensive factual record of the practices at issue in this case, as well as the Government's knowledge of and involvement in the defendants' activities.

**The Defendants and Their Contracts**

6. Defendant Nielson is a small, privately held Wyoming corporation that produces and sells oil, hydrocarbon liquids and $CO_2$ from the "McCallum" fields in northern Colorado pursuant to leases with the U.S. government.

7. The McCallum leases were originally entered into between Conoco, Inc. and the U.S. government. For many years, Conoco extracted and sold oil from the McCallum fields and simply vented to the atmosphere raw $CO_2$ gas that was produced in conjunction with the oil. There is no proximate pipeline that can transport $CO_2$ gas from the McCallum fields to locations where it can be sold and, for most of the history of the leases, there were no customers for the $CO_2$. It is undisputed that Conoco's $CO_2$ venting associated with oil production was known to and approved by Federal regulatory authorities, and that activity is not challenged in this action.

8. Conoco entered into a June 3, 1983, "Agreement for the Sale of Carbon Dioxide" ("Agreement") with Liquid Carbonic Corporation ("LCC"). (Praxair Mem. Ex. 13) Under the Agreement, LCC was obligated to construct a plant to process raw $CO_2$ gas produced and delivered by Conoco in order to purify and convert it into liquid $CO_2$. The gas produced by Conoco contained various impurities, including hydrocarbons and other non-$CO_2$ gases, which must be removed in order to yield $99.99+\%$ pure "food-grade" $CO_2$ liquid

suitable for beverages, food processing and other uses.

9. The Agreement provided that Conoco would be paid based on a price per ton of finished product shipped from the plant, with LCC reporting to Conoco the quantity shipped each month. (PHN Tab D, Agreement at §§ VI.A. and VIII.)

10. The base price per ton under the Agreement was subject to adjustments. The price would be adjusted annually according to the market prices received by LCC for its sales of the plant's finished product. (PHN Tab D, Agreement at § VI.A.) The monthly price paid was also subject to adjustments based on the quality of the raw $CO_2$ gas delivered to the plant by Conoco. One adjustment would reduce the price when additional oxygen was required to process the raw gas "in the event any of the hydrocarbons, other than methane, rise above the levels specified" in the Agreement. (PHN Tab D, Agreement at § IX.C.[3])

11. The Agreement provided that LCC would normally return to Conoco 80% of all vent gases produced from the processing plant, and that Conoco would provide the pipeline to permit the return of those gases. (PHN Tab D, Agreement at § V.E.) Conoco was charged in the Agreement with responsibility to pay all royalties on $CO_2$ delivered to LCC. (PHN Tab D Agreement at § XIV.A.)

12. In 1994, Nielson purchased certain assets from Conoco, including the McCallum leases, and succeeded Conoco as seller under the Agreement.

13. In 1996, LCC merged into Praxair, making Praxair the Buyer under the Agreement.

---

**3.** This provision was revised and simplified as part of a November 1, 1988, Amendment to the Agreement, but continued the same prac-

tice of adjusting the base price depending on the quality of oxygen delivered to the plant. (Praxair Mem. Ex. 34 at 3–4.)

14. It is undisputed that neither Praxair, nor its predecessor LCC, have ever been affiliated with Nielson or Conoco. Nor has Praxair or LCC ever been a party to the McCallum leases. (PHN Tab C.)

15. It is also undisputed that Nielson and Praxair (and formerly LCC) have no material relationship other than the Agreement. (PHN Tab C.) There is no allegation or evidence of any conspiracy, side-deal or other arrangement among the defendants.

**Government Communications, Investigations and Approvals**

16. On October 22, 1984, Conoco transmitted the Agreement to the Department of Interior's Minerals Management Service ("MMS") and asked that MMS approve the arrangement with LCC. Conoco explained that it would supply the raw $CO_2$ to LCC for processing, and receive payment based on a price per ton of finished product shipped from the plant. Conoco also advised that its plan was for plant vent gases to be returned, "run through a separator to remove any available [hydrocarbon] condensate for sale," and reinjected into one of the wells. Conoco's transmittal to the MMS included a schematic showing that some gas would be flared from LCC's plant, while some gas would be returned to a Conoco separator and then reinjected. (PHN Tab K, Praxair Mem. Ex. 58.)

17. Alerted to the fact that the volume of Conoco's $CO_2$ gas production would be measured for royalty purposes based on the LCC plant's output—or, in other words, at the plant "tailgate"—the MMS wrote Conoco on March 14, 1985 and inquired about the impact on royalties relative to volume measurement at the wellhead: "We are concerned that, if royalty is to be paid on the volume of gas leaving the plant, there could be significant differences, due to plant losses, from the volumes the [wellhead] allocation meters indicate." (PHN Tab L, Praxair Mem. Ex. 60.)

18. On March 22, 1985, Conoco responded to the March 14th MMS letter (and to a later phone conversation with MMS representatives) and explained that the plant's vent gas losses would diminish once operations stabilized. Conoco also advised that there would nevertheless continue to be unavoidable $CO_2$ gas loss because of the quality of the raw $CO_2$ delivered to the plant and the anticipated plant efficiency: "only about 76% of the produced gas can actually be liquefied and sold as liquid $CO_2$." Conoco reiterated its plan, "once the plant is on stream," to pipe vent gas from the plant through a separator and then reinject remaining gas. Conoco noted that the arrangement with LCC finally provided a means to sell $CO_2$ reserves previously shut-in or simply flared in connection with oil production. (PHN Tab M, Praxair Mem. Ex. 61.)

19. MMS approved Conoco's arrangement with LCC on April 4, 1985.[4] More specifically, MMS acknowledged and accepted the pricing provisions in the Agreement, both the base price and the adjustments related to market prices and $CO_2$ quality. After noting that "[t]he contract contains provisions for decreased prices in the event[s] any hydrocarbons, other than methane, exceed specified levels..." (i.e. the oxygen use adjustment), MMS stated that "[t]he price reduction provisions are accepted as part of the arm's length contract." MMS directed that royalties must never be based "upon less than the gross proceeds accruing to Conoco from the sale of the $CO_2$." To that end, MMS concluded

---

4. MMS advised Conoco to secure approval of its "production reporting sequence" from the Bureau of Land Management ("BLM"):

that no processing allowances could be deducted from the gross proceeds, and that royalties would be due on additional "up-front" payments or tax and/or royalty reimbursements. The MMS findings noted Conoco's plan to recover plant vent gases, separate condensates, and reinject gas remaining. (Praxair Mem. Ex. 14, Vanderwal Dep. at 172:1–172:4; Grynberg Opp. Ex. R–19, Vanderwal Dep. at 299:19–300:19.) Ultimately, Conoco did not install the piping necessary to permit return to it of all plant vent gas and did not reinject that gas into a well. MMS also found that Conoco and LCC were unaffiliated, that the Agreement was "arms-length," and that the arrangement with LCC "created the only market for $CO_2$ in the area." (PHN Tab N, Praxair Mem. Ex. 59.)

20. On November 13, 1985, MMS wrote to BLM concerning an MMS audit of Conoco's $CO_2$ production from the McCallum leases. MMS noted: "According to Forms 9–329 for the production months October 1984 through August 1985, the majority of $CO_2$ production is being vented." MMS asked that BLM provide information regarding Conoco's authority to vent this $CO_2$.[5] The Form 9–329 reports confirmed substantial gas venting, without any gas injection. (PHN Tab O, Praxair Mem. Ex. 43.)

21. The BLM responded to MMS in a December 23, 1985, Memo and advised that Conoco's gas venting was previously approved in April 1980. BLM also said that, with regard to the gas venting MMS described, "We do not wish to refute the approval granted by the Conservation Division in April 1980." (PHN Tab P, Praxair Mem. Ex. 63.)

22. The record reflects a detailed "Production Accountability Inspection" by BLM of Conoco's $CO_2$ production in the McCallum field for June 1987. During this inspection, BLM representatives reviewed the Agreement and noted that "Conoco's measurement and reporting methods were approved by the [BLM's] Craig District Office by letter dated July 1, 1985."[6] Conoco employees were interviewed to clarify methods and procedures, and production documentation was reviewed. BLM representatives visited and inspected Conoco's facilities three times. The BLM's report notes that production ancillary to oil production was either flared or, upon demand, delivered to the LCC plant, while other $CO_2$ was delivered to the plant from $CO_2$ wells. BLM also acknowledged that the LCC plant vents gas without metering, in addition to "shrinkage" (*i.e.* other gas losses) from Conoco's operations. Moreover, BLM's report explained that gas returned from the LCC plant to Conoco is passed through a separator to extract hydrocarbons, with excess gas vented (*i.e. not* reinjected), and that "Conoco has approval to flare [that] waste gas." (PHN Tab Q, Praxair Mem. Ex. 62.)

23. In 1988, Conoco sought BLM approval to alter various gas production activities, including addition of $CO_2$ supply to the LCC plant from a well in the *South* McCallum unit (previous activity and approvals had all related to wells in the McCallum unit). (PHN Tab R & PHN Tab W, Praxair Mem. Ex. 35.) In response to BLM inquiries, Conoco again described the gas production sequence. Conoco explained that $CO_2$ would be delivered to the LCC plant for processing, that

---

**5.** In general, MMS deals with matters relating to royalty calculations and payments, including gas valuation, while BLM addresses gas production issues, including the measurement location for royalty purposes. *See, e.g.* 30 C.F.R. § 206.152; 206.154(a)(1).

**6.** Although this July 1, 1985, letter has not been located, it appears to respond to the MMS April, 1985, direction that Conoco secure BLM's approval of its production reporting sequence.

effluent gas returned to Conoco from the plant would be passed through separators to remove liquids, and that excess gas remaining "will be vented." Conoco also advised that gas venting volumes are estimated by calculating the difference between gas volumes produced at the wellhead and gas volumes measured at the LCC plant tailgate (*i.e.* volumes sold), which "volumes are reported on a monthly basis to the Colorado Oil & Gas Conservation Commission ("COGC") on COGC Form 7." (PHN Tab S.)

24. The state of Colorado Department of Revenue, Mineral Audits Section, audited Conoco's October 1, 1982–December 31, 1995 Colorado oil and gas production for the United States Department of the Interior.[7] The Audit Report explained that auditors verified natural gas volumes reported against Conoco source documents, tested values reported for royalty purposes against contract terms, and verified that Conoco had used "correct royalty rates and computed royalties in compliance with the lease terms and federal regulations." After two adjustments unrelated to the McCallum field $CO_2$ production, the audit report concluded: "We consider Federal royalties for the State of Colorado to be correct for the audit period ending December 31, 1995." (PHN Tab V.[8])

25. In 1992, LCC added a dry ice manufacturing facility to its plant. Because the plant is on land leased from the Federal government, LCC sought permission from the BLM to construct that facility. In a September 1, 1992, memo, LCC advised (among other things) that $CO_2$ vapor released from the dry ice machinery would be piped back into the main $CO_2$ plant. There is no evidence that this was not LCC's intent when this statement was made. The plan to recycle the $CO_2$ vapor, however, was later abandoned as uneconomical. The government was then made aware that the vapor from the dry ice plant was vented and not recycled. (Praxair Mem. Ex. 14, Vanderwal Dep. at 78–81, 220–221; Praxair Mem. Ex. 42, Dalton Dep. at 227–229; Grynberg Opp. Ex. R–26; Praxair Reply Ex. 9, Dalton Declaration.)

26. About once a year, BLM conducts a detailed Production Accountability Inspection of the production activity in the McCallum fields. During these inspections, BLM requests and receives from Nielson (and previously Conoco) documents which disclose the actual wellhead production volumes (as distinguished from the plant "tailgate" volumes reported for royalty purposes). (PHN Tab Y, Praxair Mem. Ex. 64; PHN Tab Z, Praxair Mem. Ex. 3, Fleetwood Depo. at 53:17–25; PHN Tab AA, Praxair Mem. Ex. 5, Williams Depo. at 212:3–23.)

27. In 1996, BLM began making inquiries of Nielson about its royalty calculation and reporting practices. In response, Nielson supplied BLM with numerous documents describing its practices. This included a sample of the worksheet Nielson uses to calculate the gas value and volume for royalty purposes, which reflected the differences between total wellhead production and the lesser plant tailgate "sold" volumes reported for royalty purposes (*i.e.* excluding vented gas volumes). The work-

---

7. Section 205 of the Federal Oil and Gas Royalty Management Act of 1982 authorized the Secretary to contract with states to audit royalty payments from Federal leases within the states.

8. This audit covered the McCallum leases. (Compare Tab N at N01563 (Section 1 listing leases) with Tab V. at MMS 00855–858 (line Nos. 9, 40, 41, 42, 53 and 129).) Although the audit did result in adjustments related to processing allowances, those adjustments were unrelated to the McCallum leases involving the $CO_2$ production. (*Id.* at Tab V in the columns showing adjustments.)

sheet also reflected the calculation of price whereby the price per ton is reduced based on $CO_2$ quality. (PHN Tab BB at BLM 0166, Praxair Mem. Ex. 65.)

28. Nielson also provided an updated schematic showing the wells used to supply $CO_2$ and piping configurations to and from the plant. The schematic alludes to "shrink" at the plant, but also shows the originally anticipated gas reinjection line with the notation: "reinjection line by design currently being flared." (PHN Tab CC, Praxair Mem. Ex. 66.)

29. In addition, Nielson provided a schematic of the plant, which by then had been taken over by Praxair. The plant schematic shows that vent gas leaves the plant where liquid $CO_2$ is produced, and also escapes as vapor from the dry ice manufacturing facility.[9] (PHN Tab EE, Praxair Mem. Ex. 46.)

30. On August 22, 1996, MMS issued to Conoco and Nielson an "Order to Comply" pursuant to 30 C.F.R. § 206.154, charging them with having incorrectly reported production and royalties from McCallum wells. MMS explained: "[W]e determined that the production is being reported using an unauthorized off-lease measurement point. Because of the unauthorized measurement point being at the tailgate of the $CO_2$ plant, royalty bearing volumes are not being accounted for." (PHN Tab FF, Praxair Mem. Ex. 67.)

31. Nielson, which by then had taken over from Conoco, appealed the Order to Comply, noting its understanding that $CO_2$ volume measurement at the plant tailgate had been previously approved in November 1988. (PHN Tab GG, Praxair Mem. Ex. 68.)

32. BLM representatives met subsequently with representatives of Praxair,

Nielson and Conoco. Also attending that meeting was Ed Calvert of Nucor. Nucor had an ownership interest in the leases operated by Nielson, but has not been shown to have any other involvement with, or connection to, the gas production or royalty activities at issue. BLM's questions and concerns about the "tailgate" measurement of gas volumes for royalty purposes were addressed at that meeting. In an October 21, 1996, follow-up letter to BLM, Nielson's Chief Operating Officer noted that at the meeting Praxair had described the operation of its plant, the use of $CO_2$ gas in its processes that result "in a 20—30% reduction in the eventual quantity of pure $CO_2$ available for sale", and the variables that can influence the extent of the $CO_2$ used in the plant processing. He also noted that, at the meeting, BLM confirmed its prior approval of plant tailgate volume measurement for royalty purposes with regard to McCallum unit production, but that approvals for *South* McCallum production were not clear regarding plant tailgate measurement. At BLM's suggestion, Nielson requested formal approval for plant tailgate measurement for both McCallum and South McCallum $CO_2$ production, retroactive to November 28, 1988. (PHN Tab HH, Praxair Mem. Ex. 69.)

33. BLM thereafter confirmed that it was "comfortable with the procedures that are being used to measure, process, and maximize recovery of the $CO_2$ produced by these [McCallum] units." BLM approved the off-lease plant tailgate measurement for both McCallum and South McCallum $CO_2$ production. (PHN Tab II, Praxair Mem. Ex. 70.) MMS thereupon withdrew its Order to Comply, closed Nielson's appeal and "determined that Nielson & Asso-

---

**9.** The ice plant vent was labeled "vapor $CO_2$", but the responsible BLM representative confirmed at deposition BLM's understanding that this indicated a vent. (PHN Tab KK at 67, 204, Praxair Mem. Ex. 3, Fleetwood Depo. at 67:10–13 & 204:9–13.)

ciates, Inc., are now in regulatory compliance." (PHN Tab JJ, Praxair Mem. Ex. 71.)

34. The BLM official responsible for approving operations involving the McCallum Units, Mr. Kirk Fleetwood, testified at deposition that, based on BLM's 1987 Production Accountability Inspection, BLM understood that the LCC plant was venting gas without metering, but did not consider that a problem. He also testified that BLM was aware that the gas reinjection initially represented by Conoco did not go forward, with returned gas instead being vented, and that this difference in gas disposition was approved by BLM. (PHN Tab KK, Fleetwood Depo. at 14–15, 43, 150–151, Praxair Mem. Ex. 3.)

35. MMS Chief of Enforcement Kenneth Vogel, by sworn declaration, stated that:

> On at least two separate occasions, the MMS has reviewed the original and amended contract between Conoco and Liquid Carbonic and their successors, Nielson and Praxair. These reviews occurred in 1985 and 1998. In both reviews, MMS determined, based on the available information, that the contract was an arm's-length contract, as that term is defined by MMS regulations, and that the base price received under it was acceptable for royalty purposes, provided that royalty is never based on less than the gross proceeds accruing to the lessee (Conoco or Nielson) from the sale of the carbon dioxide. In these reviews, MMS determined that royalty has been paid on the basis of the arm's-length contract price.

(PHN Tab LL, Praxair Mem. Ex. 11.)

36. BLM Petroleum Engineering Technician James Wood, who has been responsible for several production inspections of the McCallum fields, stated in a sworn declaration as follows:

> BLM is aware that the Agreement calls for payment for carbon dioxide produced based on finished product shipped (now both liquid $CO_2$ and dry ice) from the Praxair (formerly LCC) Plant. Conoco's measurement and reporting methods initially were approved for the McCallum Unit gas by the BLM Craig District Office in a letter dated July 1, 1985. BLM has understood since the Agreement's inception that the tailgate measurement and royalty reporting method would result in royalties not being paid on lost gas (including, among other things, the carbon dioxide, nitrogen, and hydrocarbon gas content contained in the lost gas) during processing at the Plant.

\* \* \* \* \* \*

> On three occasions during my tenure with BLM I have conducted Production Inspections of varying levels of intensity of the carbon dioxide production from the McCallum Fields to ensure, among other things, that Nielson was properly measuring and reporting the correct production volumes of gas produced from the McCallum Fields. At least one of those inspections (the 1996 Inspection) resulted in further investigation of the Nielson carbon dioxide production and Nielson's underlying Federal reporting and royalty payment obligation by BLM and the United States Department of the Interior's Minerals Management Service ("MMS"). Based on my Production Inspections, I believe that Nielson has complied fully with its measurement and production reporting obligations.

\* \* \* \* \* \*

> BLM was aware that the [Praxair] Plant was losing some amount of gas when making both the food grade liquid carbon dioxide and the dry ice and that this

venting was covered under the approval for $CO_2$ venting granted ....on 4/15/80.

\* \* \* \* \* \*

BLM was aware that Praxair's Plant lost, in varying monthly amounts, inlet gas when producing food grade liquid carbon dioxide and dry ice and that Nielson, based on the tailgate measurement method, was not paying royalties on the gas lost.

\* \* \* \* \* \*

I have performed several Production Inspections of various levels of intensity since 1996 to ensure that Nielson properly has accounted for and reported the gas produced from the McCallum Fields. Based on my inspection, I believe that Nielson has properly measured and accounted for the gas produced from the McCallum Fields.

\* \* \* \* \* \*

As part of my investigation, I have reviewed analyses of the quality and quantity of gas produced from the McCallum Fields. My quantity investigations have involved comparisons of the volume of the gas produced from the wells as regularly reported to the government on Nielson's 3160s. I am satisfied that Nielson has properly reported the production volumes of the McCallum fields carbon dioxide.

(PHN Tab MM; Praxair Mem. Ex. 12.)

37. On June 26, 2000, Nielson submitted to MMS an "Extension Agreement" covering Nielson's continued sale of $CO_2$ to Praxair from the McCallum fields. Although the Extension Agreement is substantially similar to the Agreement originally entered into between Conoco and LCC, it is modified to account for various changes in actual practices (*i.e.* addition of dry ice production, reduction in returned gas volumes, recognition of venting losses, etc.). Noting the pending Grynberg action, Nielson asked that MMS confirm its continuing approval of Nielson's $CO_2$ pro-

duction, sales and royalty activity, as reflected in the Extension Agreement. The Extension Agreement would take effect upon MMS approval. (PHN Tab PP, Praxair Reply Ex. 3.) The Extension Agreement included the following provisions:

4.4. During the production of Finished Product, Praxair's Plant produces vent gases and both parties agree that under normal operating conditions there may be significant and substantial losses of the $CO_2$ stream incurred in order to produce Finished Product. The amount of losses will vary with the composition of the $CO_2$ stream, but they may from time to time exceed fifty percent (50%) of the volume of the $CO_2$ stream which is delivered by Seller to Praxair's Plant ....

\* \* \* \* \* \*

8.3. To simplify responsibility and payments for the hydrocarbons, other than methane, in the $CO_2$, it is agreed that Praxair shall pay for the first 37.5 pounds of oxygen per Ton of Finished Product used to oxidize the impurities and Seller shall pay for the oxygen in excess of 37.5 pounds per Ton of Finished Product. On or before the 20th day of each month, Praxair shall send a statement to Seller setting forth the quantity of Finished Product produced and the amount of excess oxygen used during the preceding month, and the current oxygen price for such quantities. Such excess oxygen charges shall be deducted from payments for Finished Product thus reducing the price received for $CO_2$ by Seller.

(PHN Tab QQ, Grynberg Opp. Ex. R–20.)

38. MMS responded on November 3, 2000, once again approving Nielson's royalty practices. Specifically, MMS stated:

*Relationship Between Nielson and Praxair*

. . .

Therefore, Nielson and Praxair are not affiliated under 30 C.F.R. § 206.151 (1999).

The determination of whether a contract is arm's-length is a two-part test. That is, not only must the contract be between two opposing economic interests regarding that contract. We did not find that Nielson and Praxair share employees or facilities or that the companies have identical or substantially identical business or economic interests (*e.g.*, share profit or loss risks). *See Creme' Mfg. Co. Inc. v. United States*, 492 F.2d 515 (5th Cir.1974.) Therefore, we conclude, subject to future audit and review, that the contract between Nielson and Praxair is arm's length.

*Royalty Measurement Point*

By letter dated November 14, 1996, BLM determined the tailgate of the Praxair Plant as the approved point of measurement for royalty purposes. Therefore, Nielson must pay royalties based on the volume and quality of production at the royalty measurement point.

*Royalty Valuation*

. . . .

Since the formula price is based upon what Praxair ultimately received for the finished carbon dioxide product, using this formula calculates a reasonable price for carbon dioxide produced by Nielson from the McCallum and South McCallum Fields in Jackson County, Colorado. . . .

(PHN Tab RR, Praxair Reply Ex. 4.)

**Royalty Payment Practices**

39. Nielson's actual royalty payment practices (and Conoco's) are not disputed.

Nielson has received each month data from Praxair (and previously LCC) regarding the volume in tons of finished product shipped from the plant.[10] Praxair also reports the volume of oxygen used each month in producing the finished product. (PHN Tab G, Praxair Mem. Ex. 65.) In addition, Praxair provides Nielson the pricing information regarding the annual price adjustment based on Praxair's sales. There is no allegation or evidence challenging the accuracy or truth of the data Praxair submits to Nielson.

40. Nielson each month calculates the payment due from Praxair by applying the Agreement's pricing provisions (including price adjustments) to the data supplied by Praxair, and then issuing an invoice for that amount to Praxair. (PHN Tab H, Praxair Mem. Ex. 65.) There is no allegation or evidence challenging the accuracy or truth of Nielson's invoices to Praxair in terms of adherence to the Agreement's terms and the relevant measurement data.

41. Praxair pays Nielson the invoiced amount. Nielson then remits royalties to the MMS by applying the royalty percentage due under the leases to the gross proceeds received from Praxair. Under regulations governing gas produced from Federal leases, royalties are ordinarily paid based on the gross proceeds received when the gas is sold pursuant to an "arms-length" contract. 30 C.F.R. § 206.152(a)(1), (b)(1)(i); 206.153(a)(i), (b)(1)(i).[11] It is undisputed that Nielson has always paid royalties based on the gross proceeds it receives from Praxair pursuant to the Agreement.

42. There is no evidence indicating any Praxair involvement in royalty calculation, reporting and payment other than provid-

---

10. Historically, this was only liquid $CO_2$, but later also included dry ice once the dry ice facility was added.

11. Whether the gas in this case is viewed as "processed" or "unprocessed" is not material to the analysis.

ing accurate volume and price data to Nielson pursuant to the Agreement. Praxair has not assisted Nielson in interpreting or implementing the royalty regulations. Nor does Praxair supply any other information or assistance. Praxair does not even receive copies of the royalty reports submitted by Nielson. (PHN Tab I, Praxair Mem. Ex. 5, Williams Depo. at 69:7–21, 262:22–263:12.)

**Relator Grynberg's Involvement**

43. Grynberg is essentially a stranger to the defendants and their business activities. He was not employed by or in any way associated with them and thus did not institute this action based on first-hand information gained as an "insider."

44. Grynberg reportedly made inquiries of Praxair sales representatives regarding possible $CO_2$ purchases and, unsatisfied with the prices quoted, contacted representatives of Nielson. He claims to have been told by Nielson's officers that Praxair deducts 30% of the $CO_2$ volume that Nielson delivers and then pays only about $0.24 per mcf on the balance, on which Nielson then pays royalties (Nielson's witnesses dispute Grynberg's account of their conversations). (PHN Tab VV at ¶¶ 7–8, Grynberg Opp. Ex. R–1.)

45. Grynberg then conducted his own investigation, which reportedly included the following: (i) having his employee glean pricing information from public COGCC records and Praxair customers; (ii) examining photos of the plant's exterior taken by his employee; (iii) examining published records of the gas volumes Nielson reported to the MMS; (iv) obtaining information from Federal regulatory personnel; (v) obtaining information about operations at other $CO_2$ plants. (PHN Tab VV at ¶¶ 10–17, Grynberg Opp. Ex. R–1.)

46. Grynberg's counsel wrote to the U.S. Attorney for Colorado and to the U.S. Attorney General on January 9, 1998, transmitting the complaint filed against Praxair and Nielson, as well as "copies of all of the material evidence and information which Mr. Grynberg possesses relating to the substantive issues alleged in the Complaint." (PHN Tab XX, Praxair Reply Ex. 15.) There is no documentation indicating that Grynberg communicated the allegations raised in this action to any Federal government representative prior to the time that he filed his complaint.[12]

47. In an affidavit filed in response to the Motions for Summary Judgment, Grynberg states that in December, 1997, he faxed draft versions of his complaint to Mr. Vogel at the MMS and to an attorney at the Department of Justice ("DOJ"), and discussed his allegations and theories with them. (PHN Tab VV at ¶¶ 19–20, Grynberg Opp. Ex. R–1.) Mr. Vogel in his sworn declaration, however, stated that his conversations with Grynberg related to allegations in the First Amended Complaint, which was filed more than nine months after the initial complaint.[13] (PHN Tab LL at ¶¶ 3, 5, Praxair Mem. Ex. 11.) During his deposition, taken in June, 1999, 18 months before the more recent affidavit, and thus closer in time to the events, Grynberg could not recall whether he had discussed his allegations with Mr. Vogel before filing the suit. (PHN Tab YY,

---

12. See *infra* note 23.

13. The DOJ attorney Mr. Grynberg alludes to, Mr. Terlip, is deceased. In his letter to the Attorney General, however, Grynberg's attorney noted that the DOJ attorney was familiar with allegations of a *different* case involving $CO_2$ that Grynberg had filed against others, and on that basis could evaluate this case. (PHN Tab XX at US0001016, Praxair Reply Ex. 15.) That representation is fundamentally inconsistent with the notion that the DOJ attorney had previously communicated with Grynberg about his charges against Praxair and Nielson.

Praxair Mem. Ex. 2, Grynberg Depo. at 241:18–22, 242:15–17, 242:24–243:1.) [14]

48. Grynberg's initial complaint alleged that the value of Nielson's $CO_2$ production upon which royalties have been calculated is too low. Rather than relying on the contract proceeds, Grynberg initially contended that an alternative value should have been employed because the Agreement was not "arms-length." His Amended Complaint added allegations that an alternative value was required because the defendants had engaged in unspecified "misconduct" and/or Nielson had not fulfilled its obligation to market the $CO_2$ for the mutual benefit of itself and the Government. Most recently, he also alleges that the price adjustment provided for in the Agreement relating to oxygen use is an improper "processing allowance," such that Nielson has been calculating royalties on the basis of "net" rather than "gross" proceeds.

49. Grynberg also alleges that royalties have been based on improperly low volumes. Grynberg began by alleging in his Amended Complaint that defendants applied an improper 30% processing deduction, then alleged that Praxair took without payment (or royalty) 30% of the $CO_2$ produced. Most recently, it is now clear that Grynberg's claim derives from his belief that royalties should have been paid on the basis of wellhead volumes, and that use of tailgate volumes deprived the government of royalties on $CO_2$ and other gas components that were vented to the atmosphere.

50. In answer to numerous governmental approvals of the royalty practices challenged, Grynberg's summary judgment submission further adjusted his allegations regarding gas volumes to charge that the government was misled. Specifically, he claims that the defendants secured government approval through various misrepresentations: (i) Conoco's representations that plant vent gas would be returned and reinjected into a Conoco well, (ii) a Praxair statement that $CO_2$ vapor from the dry ice plant would be captured and recycled and (iii) statements regarding the extent of $CO_2$ gas that would not be included in royalty calculations as a consequence of tailgate measurement.

## Pending Motions

51. Praxair moved for summary judgment on grounds that there had been no knowing false statement to reduce royalties. Praxair also contested this court's subject matter jurisdiction under (i) 31 U.S.C. § 3730(e)(3) (1999) (prior civil money penalty proceeding), (ii) 31 U.S.C. § 3730(e)(4) (1999) (the "public disclosure" bar), (iii) the "government knowledge" defense that predated 1986 Amendments to the Act (31 U.S.C. § 3730(b)(4) (1982)), (iv) the doctrine of "primary jurisdiction" and (v) Grynberg's lack of standing under Article III of the U.S. Constitution.[15]

52. In addition, Praxair argued that it is entitled to summary judgment because it never had any responsibility for, and does not benefit from, any purportedly false royalty activity.

53. Nielson joined in Praxair's summary judgment claims, and in addition sought summary judgment on the grounds that Nielson could not be held liable under the False Claims Act for the actions of Conoco arising before Nielson's purchase of the leasehold interests.

---

**14.** Grynberg testified that he did not recall when he communicated with Mr. Vogel, but that it was "[d]efinitely not a letter" and was "either telephone, or in person." (Praxair Mem. Ex. 2 at 242:3–243:15.)

**15.** Praxair also sought summary judgment as to at least some claims under the FCA's statute of limitations provisions and as to some of Grynberg's damages demands.

54. Because summary judgment for the defendants is appropriate based on undisputed evidence that there have been no "knowingly" false claims, and because Grynberg's claims are barred by 31 U.S.C. § 3730(e)(4) and the pre–1986 FCA statute, other asserted grounds for summary judgment will not be addressed separately.

## CONCLUSIONS OF LAW

### Summary Judgment Standards

1. Under Federal Rule of Civil Procedure 56(c), a court must render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "Summary judgment procedure is not properly regarded as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corporation v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Courts must construe Rule 56 "with due regard not only for the rights of the persons asserting the claims and defenses that are adequately based in fact to have those claims tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.*

2. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Only genuine disputes over facts that might affect the outcome of the action are relevant for summary judgment purposes. *Id.* at 248, 106 S.Ct. 2505. Although "the movant has the burden of showing that there is no genuine issue of fact, ... the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." *Id.* at 256, 106 S.Ct. 2505.

3. Two aspects of the summary judgment arguments raised in this action compel particular scrutiny of the evidence adduced by Grynberg. First, certain of the asserted grounds for summary judgment challenge this Court's subject matter jurisdiction. As the proponent of this action, it is Grynberg's burden to establish jurisdiction as a matter of law.

> Since federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction. If jurisdiction is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence. [Relators] bear the burden of alleging "the facts essential to show jurisdiction" and supporting those facts with competent proof. Mere conclusory allegations of jurisdiction are not enough.

*United States ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1160 (10th Cir.1999) (citations omitted).

4. Second, Grynberg's claims are facially suspect in economic terms, making it especially important that they be scrutinized with appropriate skepticism to assure a legitimate evidentiary demonstration of "genuine issues" as to "material facts." *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[I]f the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward

with more persuasive evidence to support their claim than would otherwise be necessary [to evade summary judgment]."). There is no dispute that Nielson pays royalties based on what it is paid under the Agreement with Praxair. Yet, Grynberg argues that Nielson willingly accepts payment based on less gas volume and a lower gas value than is appropriate. What Grynberg never explains, however, is why Nielson would voluntarily reduce its revenue stream from Praxair, from which it retains 7/8ths, just to reduce the 1/8th share it pays to the government in royalties. In this context Grynberg must demonstrate a particularly compelling case to evade summary judgment.

**Grynberg Has Not Shown Any "Knowing" False Statement**

5. Grynberg's FCA case presents a so-called "reverse" false claim, one that affects payments to rather than from the government. Under this provision, liability may be imposed upon any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government...." 31 U.S.C. § 3729(a)(7) (2000). Thus, to show any basis for liability, Grynberg must be able to adduce evidence that the defendants affirmatively and "knowingly" submitted a "false record or statement" in order to reduce royalties.[16]

6. The undisputed evidence reveals that Federal government regulatory authorities have long been apprised of the concerns presented by Grynberg's complaints, either because of information provided by the defendants (or their predecessors) or because of the government's own investigations. In the face of that government knowledge, and the defendants' awareness of that government knowledge, even if Grynberg is correct that some of the defendants' representations were inaccurate, he has not presented evidence to raise a genuine issue that the representations were "knowingly" false, as required to establish False Claims Act liability.

7. Prior to 1986 Amendments, the FCA deprived courts of jurisdiction whenever an FCA action was based upon "evidence or information in the possession of the United States or any agency, officer, or employee thereof, at the time such suit was brought." 31 U.S.C. § 232(c) (1976). Although that language, and the automatic defense it created, was removed in 1986, the government's knowledge of conduct challenged under the FCA remains relevant to liability.

8. In *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 534 (10th Cir.2000), the court recognized that "there may still be occasions when the government's knowledge of or cooperation with a contractor's actions is so extensive that the contractor could not as a matter of law possess the requisite state of mind to be liable under the FCA." The *Shaw* court cited in support two decisions from the Ninth Circuit that are also persuasive authority in this case: *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321 (9th Cir.1995) and *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412 (9th Cir.1992).

---

**16.** The "implied certification" concept that has been employed in some situations to establish liability under 31 U.S.C. § 3729(a)(1) will not apply given the requirement under § 3729(a)(7), comparable to § 3729(a)(2), for a false record or statement. *See Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531–532 (10th Cir.2000) (finding "implied certification" inapplicable where liability depends on submission of false statement or record). *See also United States ex rel. Aakhus v. Dyncorp., Inc.*, 136 F.3d 676, 682–83 (10th Cir.1998) (requiring specific false statement to support action under § 3729(a)(2)).

9. In *Butler,* the *qui tam* relator alleged false statements and claims regarding testing and performance of communications and navigation systems under a U.S. Army contract to develop and produce the Apache helicopter. The relator argued that certain testing did not conform to contract requirements and that test reports contained false statements. On appeal from a directed verdict for the defendants, the court noted undisputed factual findings of "a pattern of cooperation between the Army and [the defendant]," that "information flowed freely between [the defendant] and the Army concerning the testing," and that "all information upon which [Butler] bases his case was not only available to the Army, but in the Army's possession." 71 F.3d at 326. With that record, the district court concluded: "Given the government's knowledge of an accession at every turn to the Subsystems' testing modifications as well as to the Subsystems' limitations, [Butler] did not present legally sufficient evidence that any allegedly false statement or claim was made with the requisite intent." *Id.* Affirming, the Ninth Circuit held that the relator's arguments over the defendant's failure to adhere strictly to contract requirements raised "questions of contract interpretation rather than false claims." *Id.* While recognizing that the relator had cited some statements that might not be entirely accurate, or discrepancies that rendered technically "false" certain reported test results, these statements could not reasonably constitute "knowingly" false claims where the discrepancies were "known to and approved by the Army." *Id.* at 328.

10. The Court reached a similar result in *Wang* where, as the *Shaw* decision noted: "The government had extensive knowledge of all the engineering deficiencies identified by the qui tam relator, and the defendant had an ongoing dialogue with the government about the problems." 213 F.3d at 534. *See Wang,* 975 F.2d at 1421. *See also United States ex rel. Durcholz v. FKW, Inc.,* 997 F.Supp. 1159, 1171–1172 (S.D.Ind.1998) (no "false" statement for FCA liability where relevant government officials knew and approved of challenged methods used to submit proposal and pricing information).

■ 11. FCA liability under § 3729(a)(7) requires the "knowing presentation of what is known to be false." *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991). Although a representation and the true state of affairs may differ (or appear to differ), where both the party making the representation and the government know the "truth" of the matter, particularly where that truth has been affirmatively or openly disclosed by the representing party, the representation cannot be deemed "knowingly false" for purposes of FCA liability.

■ 12. In this case, Grynberg has failed to create any genuine issue that the defendants made any "knowingly" false statements to the government. The defendants cannot be said to have "knowingly" made false statements regarding the gas volumes used for royalty purposes when the methodology employed for measuring and reporting gas production was known to and approved by the responsible government authorities. Likewise, statements about the value assigned to the gas for royalty purposes was not knowingly false when the approach used to determine that value was openly disclosed to the government and repeatedly accepted.

13. The specific practice of measuring McCallum field $CO_2$ gas at the plant tailgate, rather than at the wellhead, was brought to the government's attention and approved as early as 1985 (twice). There is documentation that this practice was

assessed and approved again by the government at least in 1987, 1989, 1996 and 2000. This practice has also apparently been observed during repeated, annual audits and inspections of the production and reporting practices followed by Conoco and Nielson. As in *Butler*, the evidence reveals such complete cooperation and information sharing with the government that royalty reports based on these measurement and valuation practices cannot reasonably be considered "knowingly false."

14. Grynberg's suggestion that the government was misled when evaluating the volume measurement practice, and deceived into approving it, is not supported by the evidence that has been presented. First, Conoco's statements that it would recover and reinject most plant vent gas has not been shown to have been a false representation of the anticipated practices at the time the statement was made. Even if considered false because later practice differed, that fact was openly and repeatedly disclosed to the government by Conoco and Nielson in various correspondence and reports. Indeed, even before the end of 1985, Federal authorities knew that substantial gas was being vented without reinjection, which left that gas unmeasured and unreported for royalty computation purposes. The government's own 1987 inspection report and specific written communications to the government in 1989 and 1996 record that the gas is vented rather than reinjected. Yet, the government reapproved the royalty practices late last year despite the known discrepancy from Conoco's originally stated intent.

15. Similarly, Grynberg's allegations that the government was misled about the extent of gas venting is unavailing. Even if Grynberg's calculation of gas losses are more accurate than what the defendants may have projected or reported, Grynberg has demonstrated no more than inaccuracy or mistake, not actionable false statements. *See Wang,* 975 F.2d at 1420–1421. Moreover, Conoco and Nielson were entirely open with the government about the extent of the differences between the wellhead volumes and the tailgate volumes reported for royalty purposes. The different volumes were variously reported to state and federal authorities, both in routine submissions and pursuant to information requests in the context of periodic audits or inspections. Government authorities had available the very same data from which Grynberg derives his argument that gas loss figures supplied by the defendants were inaccurate. Grynberg's assertions may be the basis for a disagreement over calculation methods, but they do not establish the requisite intent under the FCA of "knowingly false" statements.

16. Praxair's statement that ice plant vapor would be recycled also falls short of a "knowingly false" statement for FCA purposes. There is no evidence that the stated intent, made before the dry ice facility was even built, was false when made. The only evidence is that this practice was the initial expectation, despite actual practice that later differed. There is also no evidence that the statement was made for the purpose of reducing royalties, given that Praxair did not pay royalties and tailgate volume measurement had already been approved. Most importantly, however, the actual differing practice was voluntarily disclosed to the government, which nevertheless continued to approve the measurement and royalty methods being used.[17] As in *Butler*, the government

17. Given Grynberg's claim that royalties should have been paid on wellhead volumes, and the government's knowledge of the extent of unmeasured venting at the plant (based on comparison of wellhead and tailgate volumes), representations about where at the plant the venting occurred (*i.e.* dry ice vs. other operations) are not at all material.

knew of and approved the discrepancy and, as such, the original statement cannot reasonably be deemed "knowingly false."

17. Grynberg's claims that the gas was undervalued also present no basis for FCA liability. Indeed, Grynberg has identified no "false statements" at all with regard to his argument that royalties were computed on a gas value that was too low. Consistent with typical practice under Federal regulations, and with the government's recognition and approval, Conoco and Nielson paid royalties based on the total, "gross" proceeds received from sale of the $CO_2$ under an arms-length contract. The nature of the contract and its pricing provisions as well as the defendants' relationship, were all fully disclosed to the government from the outset. As to the undervaluing claim, there are no false statements alleged, much less evidence of any effort to "knowingly" misrepresent this royalty practice.

18. Grynberg alleges, as best as can be discerned, that the value used for royalty purposes was "false" because it was "unreasonably" low and so a higher value should have been used. Even if Grynberg were correct as a matter of regulatory interpretation, the value employed was not "knowingly false." The government was apprised of and accepted the valuation approach followed. Grynberg's argument may raise a dispute over how the regulations should have been applied in this instance, but such regulatory debates are not actionable under the FCA. *See United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1266 (9th Cir.1996), *X Corp. v. Doe,* 816 F.Supp. 1086, 1093 (E.D.Va.1993).

19. Grynberg's allegations that a different gas value should have applied because of "misconduct" or a "failure to market" for the mutual benefit of the lessee and the government likewise do not trigger FCA liability. The only "misconduct" to which Grynberg alludes are the sup-

posed misrepresentations about gas volume, which as already explained were not "knowingly false." There is no evidence that Conoco's and Nielson's $CO_2$ marketing, in the form of sales under the Agreement, did not mutually benefit the lessees and the government. In any event, that marketing practice was fully disclosed to and approved by the government, as opposed to being "knowingly false."

20. Grynberg also argues that Nielson has falsely paid royalties based on "net" proceeds while reporting royalties as having been paid on "gross" proceeds under the Agreement. Specifically, Grynberg argues that the price adjustment provided for in the Agreement based on oxygen used in the plant is a "processing allowance" improperly deducted from gross proceeds before royalties are computed. The evidence does not support that contention. This price adjustment provision was disclosed to and approved by the government from the beginning. An adjustment to the $CO_2$ price is triggered monthly based on the quality of raw gas supplied. This adjustment affects the base price paid under the Agreement and so may reduce the total proceeds received. It is not, however, an amount that Nielson deducts from the proceeds received under the Agreement and on which it pays royalties. Rather, it affects the extent of those receipts in a given month in the same manner that gross receipts are influenced by the volumes sold and annual price adjustments. In its 1985 approval letter, MMS described this feature of the Agreement as a "provision for decreased prices" and a "price reduction provision," not as a "processing allowance." Notably, royalties based on gross proceeds received under this pricing arrangement were reapproved by MMS in 2000, even after Grynberg's claims were presented. While Grynberg may disagree with this aspect of the Agreement's pricing mechanism, paying

royalties based on the resulting "gross" proceeds did not produce "knowingly false" statements of gas value.

21. In sum, Grynberg's allegations all relate to conduct or concerns that the government has known about and approved. Royalties based on these disclosed and approved practices cannot reasonably be treated as "knowingly false" statements meant to reduce royalty obligations to the government. Having failed to show any basis to conclude that the defendants acted with the requisite intent to establish FCA liability, summary judgment for the defendants is appropriate.

**Pre–1986 Knowledge**

22. Prior to 1986, the FCA barred, without exception, suits based on information already in the government's possession. 31 U.S.C. § 3730(b)(4) (1982). The U.S. Supreme Court has held that 1986 amendments to the FCA, which eliminated that statutory bar, were not retroactive. *See Hughes Aircraft Co. v. United States ex rel. Schumer,* 520 U.S. 939, 946, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). As a result, claims based on pre-Amendment conduct and government knowledge remain barred. *Id.* The "crucial event for purposes of non-retroactivity is the alleged presentation by [the defendant] of a false claim, and not the public disclosure of that conduct." *United States ex rel. Lujan v. Hughes Aircraft Co.,* 162 F.3d 1027, 1031 (9th Cir.1998). Because Grynberg's claims are based on information and conduct known to the government before the 1986 Amendments, his action is statutorily barred.

23. Review of Grynberg's initial and amended Complaints confirms that his allegations rest on knowledge that (i) due to tailgate measurement substantial gas volumes were not included in royalty calculations and (ii) royalties were based on the price paid for $CO_2$ under the Agreement (which Grynberg considers too low).

24. Before the end of 1985, the Government was fully aware that substantial $CO_2$ gas volumes were being excluded from royalty calculations and were instead being vented to the atmosphere. Based on comparison of wellhead and plant tailgate volume measurement, the government knew the extent of that gas loss. The government also knew the terms of the Agreement under which the $CO_2$ was sold (including the pricing provisions), as well as the actual value (per mcf) upon which royalties were being calculated and paid. In short, prior to the 1986 FCA Amendments, the government had possession of all the information on which Grynberg based his action.

25. The fact that royalty reports and payments based on tailgate volumes and contract proceeds continued after the 1986 Amendments does not preserve Grynberg's action. The continuing royalty practices were unchanged from those that preceded the 1986 Amendments. Grynberg's claims are based on the same gas volume and value reporting approach that preceded the Amendments and about which the government was fully informed before 1986.

26. Once it was determined in 1985 that royalties would be paid based on tailgate volumes and proceeds resulting from contract prices, the post–1986 royalty reports and payments on that basis were "true." Royalty reports reflected the approved practices. The only thing "false" that Grynberg challenges is the undertaking to calculate royalties on volumes "knowingly" below wellhead production levels and "knowingly" below the prices at which finished $CO_2$ products are sold. That entire concept and approach to royalty reporting and payment was completely established in 1985. There was no new "offense" perpetrated thereafter, only rep-

etitious submissions based on the initially approved practices.

27. The Supreme Court has rejected retroactive elimination of the FCA's statutory bar on qui tam actions:

Prior to the 1986 amendment, respondent's qui tam action was completely barred because of Hughes' disclosure to the Government of information about its claims submissions. [Retroactively applying] [t]he.1986 amendment would revive that action, subjecting Hughes to previously foreclosed qui tam litigation, much like extending a statute of limitations after the pre-existing period of limitations has expired impermissibly revives a moribund cause of action....

*Schumer,* 520 U.S. at 950, 117 S.Ct. 1871 (citation omitted). The royalty practices challenged in this case were established prior to the 1986 Amendments and the statutory defense available to claims that those practices create FCA liability was not retroactively eliminated by the Amendments. Consequently, Grynberg's claims are properly dismissed based on this Court's lack of subject matter jurisdiction.

**Public Disclosure Bar**

28. The FCA's jurisdictional requirements provide that no court has jurisdiction over a private qui tam lawsuit based on the public disclosure of allegations of wrongdoing unless the relator is an "original source" of the information. *See United States ex rel. Fine v. Advanced Sciences,* 99 F.3d 1000, 1004 (10th Cir.1996); 31 U.S.C. § 3730(e)(4)(A). The purpose behind this jurisdictional bar is to achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *United States ex rel. Fine v. Sandia Corporation,* 70 F.3d 568, 571 (10th Cir.1995) (quotation omitted). This purpose is not served by allowing qui tam relators to recover where the government has already identified the problem and has an easily identifiable group of probable offenders. *See id.* at 572–73. As a result, a relator's claim should be analyzed "in the context of Congress' 'twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own.'" *See Advanced Sciences,* 99 F.3d at 1004 (quotations omitted). This Court's fundamental task in interpreting the FCA is "to give effect to the intent of Congress." *United States v. American Trucking Ass'ns,* 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

29. In light of the Congressional intent and legal background of the jurisdictional bar to qui tam suits, it is apparent that there are two situations to which the jurisdictional bar may apply. The first is where the government is actively pursuing the alleged wrongdoing when the qui tam action is sought. In such a situation, there is no need to determine whether the alleged wrongdoing has been publicly disclosed because it is clear that the government "has already identified the problem." *Sandia,* 70 F.3d at 572. The second situation is where the government is not actively investigating the alleged wrongdoing. In this situation, the appropriate inquiry for the purposes of the jurisdictional bar is whether the government is "capable" of pursuing the suit itself. This "capability" inquiry requires determination of whether the complaint is "based upon" a "public disclosure" within the meaning of 31 U.S.C. § 3730(e)(4)(A). Such a determination requires consideration of four separate questions:

(1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources;
(2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act;

(3) whether the relator's complaint is "based upon" this "public disclosure"; and if so,

(4) whether the relator qualifies as an "original source" under section 3730(e)(4)(B).

*Advanced Sciences,* 99 F.3d at 1004. (citing *United States ex rel. Fine v. MK–Ferguson Company,* 99 F.3d 1538, 1545 (10th Cir.1996)).

 30. In this case, it is plain that the government repeatedly investigated the very concerns that Grynberg has raised and is thus more than "capable" of pursuing them itself. Multiple times it has examined the practice of tailgate volume measurement and its implications for Federal royalty payments. At oral argument, Grynberg's counsel acknowledged that there is no difference between Grynberg's FCA claim that royalties should be based on wellhead rather than tailgate volumes and the MMS 1996 Order to Comply addressing that very issue. Likewise, the value assigned to the $CO_2$ for royalty purposes, and the sales contract from which that value derives, was formally examined and approved by the government in both 1985 and 2000, and was scrutinized in several royalty audits. An FCA action was not needed to bring these concerns to the government's attention and trigger active investigations. Based on this state of affairs

alone, this Court should not take jurisdiction over Grynberg's claims.

 31. Summary judgment also follows, however, even under a more detailed "public disclosure" bar analysis. The "allegations" or "transactions" upon which Grynberg's case is based were publicly disclosed in a response to a Freedom of Information Act ("FOIA") request that Grynberg made to the MMS. The MMS response included pages from its 1985 letter describing Conoco's Agreement with LCC and related "Findings and Conclusions." (PHN Tab XX at US001018–US001019, Praxair Reply Ex. 15.) These documents resulted from the MMS administrative investigation triggered by Conoco's request for approval.[18] The documents revealed that Conoco was selling the $CO_2$ under a contract with LCC and that LCC would pay Conoco a price per ton based on the finished product measured at the plant tailgate.[19] Thus, the documents disclosed what Grynberg alleges to be both the "true" and the "misrepresented" facts: the "true" wellhead volumes would be "misrepresented" by reporting as production for royalty purposes only the lesser tailgate volume. Likewise, it revealed that royalties would be paid based on the Agreement proceeds, not on the basis of proceeds from LCC's subsequent sales of finished products as Grynberg insists is required.[20] The Tenth Circuit has

---

**18.** Although Grynberg challenges the vigor of that investigation, it plainly falls within the broad range of pursuits that qualify as an "administrative...investigation" from which the allegations or transactions must be publicly disclosed for purposes of the jurisdictional analysis under § 3730(e)(4). *See United States v. Bank of Farmington,* 166 F.3d 853, 862 (7th Cir.1999) (official agency inquiry); *United States ex rel. Doe v. John Doe Corp.,* 960 F.2d 318, 323–324 (2d Cir.1992); *United States ex rel Mistick PBT v. Hous. Auth. of the City of Pittsburgh,* 186 F.3d 376, 384 (3d Cir.1999), *cert. denied,* 529 U.S. 1018, 120

S.Ct. 1418, 146 L.Ed.2d 310 (2000) (processing FOIA request).

**19.** Although the specific price was not disclosed in the FOIA response document, it was part of the administrative investigation and was learned by Grynberg from other public sources.

**20.** Grynberg alleges that $CO_2$ value for royalty purposes should have been based on the market price for products produced by the plant. (*See* PHN Tab TT, Amended Complaint ¶ 23 ($CO_2$ value should be $3.45/mcf); PHN Tab

determined that a disclosure constitutes an "allegation" or "transaction" sufficient to trigger the public disclosure bar when it presents the issue "in a questioning light." *United States ex rel. Fine v. Advanced Sci.*, 99 F.3d 1000, 1005 (10th Cir.1996). The transaction disclosed in the documents produced to Grynberg under FOIA yielded the very information that had earlier "set the government squarely on the trail" of the same concerns raised by Grynberg's claims. In response to that same information, the government made its own inquiries about the impact that plant losses would have on tailgate volume measurements relative to wellhead volumes.[21] Disclosure pursuant to a FOIA request is widely recognized as sufficient to make the transaction "public" within the meaning of the FCA. *See United States v. A.D. Roe Company, Inc.*, 186 F.3d 717, 723 (6th Cir.1999); *United States ex rel. Schumer v. Hughes Aircraft Co.*, 63 F.3d 1512, 1519–20 (9th Cir.1995), vacated on other grounds, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997). Grynberg's allegations are undeniably based upon the same transaction publicly disclosed in the FOIA materials: use of tailgate rather than wellhead volumes and gas valuation based on the contract price rather than higher finished product sales prices.

32. The pertinent allegations and transactions were also publicly disclosed in the context of the 1996 MMS Order to Comply and the subsequent administrative investigation. In that setting, MMS and BLM were specifically examining the propriety of paying royalties based on tailgate rather than wellhead volumes, the very conduct on which Grynberg's FCA claims rest. That administrative investigation

was disclosed to Ed Calvert. In this circuit, providing the allegations or transactions to a single individual previously unconnected with the fraud is sufficient to constitute a "public disclosure" under the FCA. *United States ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000, 1005 (10th Cir.1996); *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1521 (10th Cir.1996). The only evidence presented in this case indicates that Conoco and Nielson have had total responsibility for all royalty calculation and reporting activity. (*See, e.g.,* Praxair Mem. Ex. 5 at 229–231 (regarding Nielson's staff preparation of MMS royalty report forms).) As in *Advanced Sciences*, Grynberg has not met his burden on this jurisdictional issue to show that Mr. Calvert was no stranger to the fraud, even if the company he works for did invest in the McCallum properties. 99 F.3d at 1005 ("Fine has pointed to no facts indicating that Sikora otherwise had some involvement with the alleged fraud through other means independent of Fine's disclosure to him.").

■ 33. In light of these public disclosures, the analysis turns to whether Grynberg qualifies as an "original source." The answer is no. First, Grynberg has not demonstrated that he had "direct and independent knowledge of the information on which the allegations are based," a requirement of 31 U.S.C. § 3730(e)(4)(B). Grynberg does little more than proclaim that "his knowledge was not derivative of others, but rather was based on his own investigation." The Tenth Circuit has made clear, however, that such conclusory assertions are insufficient.

VV, ¶ 11 (alleging Praxair sales price for plant products of $3.45/mcf), Grynberg Opp. Ex. R–1.)

21. Grynberg acknowledged to the U.S. attorney that this information about Conoco's sales

at the plant tailgate formed "the basis for the complaint." (Grynberg Opp. Ex. R–5.) He submitted the FOIA response to the Department of Justice as part of the "material evidence and information" relating to his allegations. (PHN Tab XX.)

To establish original source status knowledge, a qui tam plaintiff must allege specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge of the fraudulent acts alleged in the complaint and support those allegations with competent proof. Only in this way will the district court be able to adequately identify legitimate qui tam actions and weed out parasitic plaintiffs who offer only secondhand information, speculation, background information or collateral research.

*United States ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1162–1163 (10th Cir.1999) (finding that qui tam plaintiffs failed to establish that they qualified as original sources where they failed to offer particularized fact allegations identifying what fraud the plaintiffs witnessed).

34. Grynberg, not an insider, did not witness any fraud. Grynberg has not identified a single element of his "investigation" that involved anything other than second hand information, speculation, background information or collateral research (*i.e.* conversations with Nielson officers, conversations with various third parties, telephone calls to Praxair, FOIA requests, research at the COGCC, photographs from a public road, review of oil and gas publications, and speculation regarding what would have been a fair $CO_2$ price), precisely what the Tenth Circuit found insufficient in *Hafter.* *See also United States ex rel. Aflatooni v. Kitsap Physicians Servs.*, 163 F.3d 516, 526 (9th Cir.1999) (finding that relator who offered only conjecture and speculation regarding alleged fraud did not qualify as an original source); *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1159 (2nd Cir.1993), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (denying original source status to plaintiff who possessed some background knowledge, but who was not the source of the core information underlying the complaint). At best, Grynberg learned of alleged possible wrongdoing from insiders at Nielson and then conducted further investigation into the matter. Such second hand information and research does not constitute direct and independent knowledge under the FCA. *See United States ex rel. Devlin v. State of Cal.*, 84 F.3d 358, 361 (9th Cir.), *cert. denied,* 519 U.S. 949, 117 S.Ct. 361, 136 L.Ed.2d 252 (1996) (holding that realtors who learned of defendant's wrongdoing from an insider and conducted an investigation to confirm the allegations, did not have "direct and independent" knowledge because they "did not see the fraud with their own eyes or obtain their knowledge of it through their own labor unmediated by anything else."). Grynberg's investigation, general knowledge, education, experience and expertise do not render him an "original source."

35. Second, the contemporaneous written record confirms that Grynberg did not make the jurisdictional pre-filing disclosures required by the FCA. 31 U.S.C. § 3730(e)(4)(B) (1999). On January 9, 1998, *after* filing his Complaint, Grynberg provided the Department of Justice ("DOJ") with notice of his FCA action by letters to the Honorable Janet Reno and to the Colorado U.S. Attorney. Neither letter indicates or suggests any prior communication between Grynberg and the United States regarding the matter, but rather both suggest that this was the first time Grynberg had provided his material evidence to the United States. At best, Grynberg has only limited or conflicting recall as to what information he may have provided to the government about his claims before filing the complaint. There is no corroborating written record of Grynberg having transmitted any information about his claims to the government before

filing the complaint.[22] Grynberg has not met his burden to establish that he made the jurisdictionally required pre-filing disclosures.[23]

## No Praxair Liability

36. Grynberg's claims against Praxair must also be rejected because he has not shown that Praxair made any false statements to reduce obligations to the U.S. government. All royalty reports and payments were prepared and submitted by Conoco and Nielson, without any involvement by Praxair (or LCC). Praxair's only role was providing accurate information (*i.e.* tailgate volume measurements, oxygen use volumes, sales price data) pursuant to the Agreement. Because it was not the lessee, it had no royalty obligations to the government and its economic position was fixed by the Agreement, regardless of the royalties Conoco and Nielson paid. The only alleged misrepresentations Grynberg assigns to Praxair and LCC are the 1992 report that ice plant $CO_2$ vapor would be recycled and a 1996 under estimate of $CO_2$ losses associated with the plant. Given that (i) the challenged royalty practices were approved both before and after these representations, (ii) the government knew the extent of venting based on knowledge of both wellhead and tailgate volumes and (iii) the government approved the venting and royalty practices even after learning that ice plant vapors were not being recycled, there is no basis for any inference that these LCC and Praxair statements were made for the purpose of reducing royalty obligations. Moreover, Grynberg argues that wellhead volumes and an alternative $CO_2$ market value should have been used to calculate royalties. The wellhead measurements and the decision of what value to use when calculating royalties were always controlled by Conoco and Nielson. Praxair was thus totally irrelevant to the royalty underpayments that Grynberg alleges. Consequently, Grynberg has not presented evidence of a genuine issue on any element necessary to sustain an FCA action against Praxair, making summary judgment for Praxair the appropriate outcome.

## Conclusion

37. Based on the foregoing conclusions of law in paragraphs 1–36 above, summary

22. At the March 2, 2001, hearing, Grynberg represented that he was not aware of any evidence to support a conclusion that the requisite pre-filing disclosures were made (i.e. fax transmittal sheets, copies of letters, etc) other than Grynberg's December 2000 Affidavit. (Hearing 117:18–118:10) This representation came following discovery by the parties and extensive briefing on the issue of pre-filing disclosure as part of the motions for summary judgment. Nevertheless, on March 16, 2001, Grynberg filed "evidence," to support a conclusion that the requisite pre-filing disclosures were made. This evidence consists of a letter from Grynberg to Mr. Vogel dated September 29, 1997. Accompanying the letter is an affidavit signed by Grynberg's current secretary, Beverly Lunnon, which indicates that she discovered the letter on March 6, 2001, in Grynberg's computer. This letter and affidavit, however, do not support a finding that Grynberg made the requisite pre-filing disclosures. Ms. Lunnon did not work for Grynberg in 1997 and does not represent that the letter was ever sent to Mr. Vogel. No evidence indicates that the letter was ever signed by Grynberg, or sent to Mr. Vogel, prior to the filing of the Complaint. Moreover, that this letter appeared only after the March 2, 2001, hearing is suspect. Not only does the letter have no evidentiary value, but its authenticity is questionable.

23. Having previously testified that he could not recall the timing of his disclosures, and having provided no corroboration, the court will not accept Grynberg's much later affidavit purporting to detail such disclosures as the basis to create an issue on this point in order to defeat summary judgment. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986); *Katz v. Aurora*, 85 F.Supp.2d 1012, 1017 (D.Col.2000).

judgment must be granted to defendants Praxair and Nielson.

Accordingly, it is

ORDERED that Defendant Nielson & Associates, Inc.'s Motion for Summary Judgment filed April 6, 2000, is GRANTED. It is

FURTHER ORDERED that Defendant Praxair, Inc.'s Motion for Summary Judgment filed April 6, 2000, is GRANTED. It is

FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE. It is

FURTHER ORDERED that each party shall bear its own attorney's fees. Defendants, as the prevailing parties, shall have their costs by the filing of a bill of costs with the clerk of this court within ten (10) days of the entry of judgment. It is

FURTHER ORDERED that Defendant Praxair Inc.'s Motion to Strike Certain of Plaintiff's Experts filed January 24, 2000, is DENIED AS MOOT. It is

FURTHER ORDERED that Defendant Nielson & Associates, Inc.'s Motion to Strike Plaintiff's Experts filed March 24, 2000, is DENIED AS MOOT. It is

FURTHER ORDERED that Relator's Objection to Order of Magistrate Judge Denying Relator's Motion to Set Aside, Clarify or Modify Protective Order filed October 25, 2000, is DENIED AS MOOT. It is

FURTHER ORDERED that Relator's Motion for Order to Disregard Vogel and Wood Testimony at the Summary Judgment Stage filed December 22, 2000, is DENIED.