**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NYLE J. HOOPER,
　　　　　　*Plaintiff-Appellant,*

　　　　　　v.

LOCKHEED MARTIN CORPORATION,
　　　　　　*Defendant-Appellee,*

────────────────────

UNITED STATES OF AMERICA, Ex
rel.,

　　　　　　*Plaintiff.*

No. 11-55278

D.C. No.
2:08-cv-00561-DSF-
FMO

OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
May 10, 2012—Pasadena, California

Filed August 2, 2012

Before: Harry Pregerson, Susan P. Graber, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Pregerson

## COUNSEL

Joseph A. Black, The Cullen Law Firm, PLLC, Washington, D.C., for the plaintiff-appellant.

Mark R. Troy and Mana E. Lombardo, Crowell & Moring, LLP, Los Angeles, California for the defendant-appellee.

Catherine Y. Hancock, United States Department of Justice, Washington, D.C., for the amicus.

## OPINION

PREGERSON, Circuit Judge:

Plaintiff-Appellant Nyle J. Hooper brings suit under the qui tam provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, against Lockheed Martin Corporation ("Lockheed"). The FCA permits individuals, known as "relators," to file suit on behalf of the United States seeking damages from persons who file false claims for government funds.

31 U.S.C. § 3730(b)(1). Hooper alleges that Lockheed defrauded the United States Air Force under a contract for the Range Standardization and Automation ("RSA") IIA program concerning software and hardware used to support space launch operations at Vandenberg Air Force Base and Cape Kennedy. Hooper filed his qui tam suit in the District Court for the District of Maryland, which transferred the suit at Lockheed's request to the Central District of California on forum non conveniens grounds. The California district court granted summary judgment in favor of Lockheed on all grounds.

For the reasons set forth below, we affirm in part and reverse in part the district court's grant of summary judgment.

## BACKGROUND[1]

### A.

Relator Hooper worked for six years for Lockheed. He was hired on April 29, 1996, as a Senior Research Operations Engineer and later became a Senior Project Engineer assigned to work on the RSA IIA Program. On July 19, 2002, Hooper was involuntarily terminated after investigating the fraud alleged in his qui tam complaint and after threatening to report the fraud to the government.

On July 18, 2005, Hooper filed his qui tam action in Maryland against Lockheed, asserting causes of action under the qui tam provisions of the FCA and under § 3730(h) of the FCA for retaliation in employment for FCA-protected activity. In addition, Hooper alleges that Lockheed violated the FCA by: (1) knowingly underbidding the contract; (2) including undisclosed freeware in software deliverables that did not

---

[1]Because we are reviewing a grant of summary judgment in favor of Lockheed, we state the facts in the light most favorable to Hooper. *Dark v. Curry County*, 451 F.3d 1078, 1082 n.2 (9th Cir. 2006).

convey all intellectual property rights; and (3) failing to perform all required tests or improperly conducting those tests.

**B.**

In 1995, the United States Air Force awarded the RSA IIA contract to a predecessor of Lockheed.[2] The objective of the contract is to "automate, standardize, and modernize software and hardware used to support our nation's space launch operations . . . at Vandenberg Air Force Base (Western Range) and Cape Kennedy (Eastern Range), while also providing continued support for and transition from legacy systems."

The contract is a cost reimbursement plus award fee contract, under which the contractor is not paid a fixed price, but instead is reimbursed for its actual costs and receives periodic award fees based on its overall performance, including spending less money than estimated. The Air Force concluded that the contract would be a cost-reimbursement contract because "uncertainties inherent in the requirements render attempts to establish a fixed-price unrealistic."

At the original contract competition, the Air Force issued to potential bidders a Request for Proposal ("RFP"). The RFP laid out six factors that the Air Force would consider in deciding which company would win the contract. The first four factors (management, systems engineering, systems integration, and product development) were first and equal in importance. The fifth factor — cost — was second in importance, but was a significant consideration in the decisional process. The Air Force "informed the offerors that it may select an offer that is not the lowest priced technically acceptable offer, but may instead select a higher priced offer that represented the 'Best Value' to the Government."

---

[2]Lockheed took over the performance of the RSA IIA contract, as the successor company. It is undisputed that Lockheed stands in the shoes of the predecessor and assumes liability. For the sake of consistency, we will refer to Lockheed only.

Three companies responded to the RFP. Lockheed's initial bid was $439.2 million, but its Best and Final Offer was $432.7 million. To compare the three final offers, the Air Force hired independent consultants to create an "Independent Government Estimate."

After conferring with independent consultants, the Air Force drafted a memorandum summarizing the bid process. The memorandum concludes, in relevant part, as follows:

> [Lockheed's] cost estimating and risk analysis practices were assessed for compatibility with the technical approach and for the probable accuracy of the methodologies employed. . . . The assessment . . . found that [Lockheed] employed realistic methods . . . but was optimistic about some of the inputs to the methodology, resulting in an overstated potential for cost savings. [Lockheed's] Risk Analysis was found to be unrealistic: the methodology employed is sound in theory, but the inputs (severity of certain risks) are understated, so the total risk is understated. Also, technical risks are not explicitly quantified, as specified in the RFP. However, defects in the Risk Analysis were not considered a discriminator, since the Risk Analysis accounted for only a portion of one of the Cost Factors. Overall, [Lockheed] was found "realistic" for this factor.

In its summary, the Air Force stated that although Lockheed did not submit the lowest bid, Lockheed's bid provided the "best overall value," knowing that it was possible that there were "risks" that might "lead to cost growth beyond target cost." The Air Force concluded that "the risk potential is acceptable . . . and . . . determined that a fair and reasonable price was obtained without reliance on certified cost or pricing data." Accordingly, the Air Force awarded Lockheed the RSA IIA contract. Lockheed has been paid more than $900 million for its work on the RSA IIA contract. Hooper did not

work for Lockheed when Lockheed's proposal was prepared or when the Air Force awarded Lockheed the RSA IIA contract.

Lockheed employee Mike Allen, one of the individuals who prepared cost estimates for the RSA IIA program, testified that Lockheed employees were instructed to lower their estimates without regard to actual costs. Although Allen did not see the final bid, he saw "some of the workups that they had done in the bidding process." He concluded that the inputs used to compute the final bid were based on "bad, bad guesses" but were not false.

## C.

### 1.

After winning the contract, Lockheed sent the Air Force a series of seven letters in which Lockheed disclosed its use of "software to be provided with less than unlimited rights" ("Disclosure Letters"). This software, also referred to as "FOSS", is "freely downloadable open source software from which the human-readable source code is available for use, study, reuse, modification, enhancement, and redistribution by the users of that software." FOSS can be downloaded at no charge, but "comes with license restrictions which are generally aimed at preserving the free and open nature of the particular FOSS product." The Disclosure Letters listed a description of the software, the name of the manufacturer, the product in which it is used, the intended use, and the software license type. The Letters also "requested that the Air Force review the identified items, and provide its concurrence with [Lockheed's] use of them."

The Air Force Contracting Officer issued responses to these Disclosure Letters and approved each use of the disclosed FOSS. For example, in its June 2, 2005 response letter, the government stated that "the Government hereby acknowl-

edges and approves the use of the subject software by [Lockheed]" and "[t]he Government believes this discretion to be within the current contractual requirements[,] estimated costs, and terms and conditions."

Marilyn Washington, the Air Force Contracting Officer for the RSA IIA program from 2000-2005, testified that she interacted daily with Lockheed personnel on the RSA IIA program. As Contracting Officer, she was required to respond to Lockheed's Disclosure Letters. Relying on Air Force Deputy Program Manager Cory Pike, she responded to the Lockheed Disclosure Letters approving the use of the FOSS items listed in the letter. "At no point during [her] tenure as Contracting Officer on the RSA IIA contract" did Washington recall "anyone ever saying that FOSS was not permissible under the contract." Nor was she "aware of any violations by Lockheed Martin under the RSA IIA contract." Washington did not believe that there was any obligation under the RSA IIA contract that required Lockheed to disclose the use of freeware at any time.

Pike stated that he interacted daily with Lockheed regarding the RSA IIA program. Pike was "the Air Force person in charge of coordinating the Air Force's assessment of the use or incorporation of [FOSS]." He stated that the Air Force employed independent contractors to provide the Air Force "with assessments of various technical issues under the RSA IIA contract, including technical assessments about the use of FOSS." Pike provided the independent assessments and his own recommendation to Washington, who formally approved the use of the disclosed FOSS. He stated that he "never had any reason to believe that Lockheed Martin should have made its FOSS disclosures at some earlier point in time." Pike also said that "the Air Force, at all times, had the opportunity and option to make changes to exclude the use of FOSS if it had deemed such changes necessary. The Air Force did not deem any such changes necessary or important."

At his deposition, Hooper admitted that he does not know if there is any particular contract provision, Air Force mandate, standard, or any other requirement that dictates the timing of the disclosure of the use of FOSS in the RSA IIA contract. He further admitted that his claim regarding the Air Force's fraudulent use of FOSS was based on guesswork and Google searches.

## 2.

Lockheed invited the Air Force and its consultants to observe its RSA IIA program testing. The Air Force consultants had keys to Lockheed's facilities, and some Air Force consultants had offices in those facilities. The Air Force and its consultants "reviewed and commented on test plans and procedures, discussed testing verification methods, reviewed test reports, and witnessed testing."

Hooper was not involved with testing for the RSA IIA program. He admitted that he "has no personal knowledge to support his allegation that Lockheed Martin had a 'practice' of not performing 30-50% of testing." He also admitted that his allegations based on testing are "predicated on information provided to him by" two other Lockheed employees.

## PROCEEDINGS

On July 18, 2005, Hooper filed his qui tam action under the FCA against Lockheed, asserting causes of action under the qui tam provisions of the FCA and under § 3730(h) of the FCA for retaliation in employment for FCA-protected activity. Hooper originally filed his complaint in the District Court for the District of Maryland. While the case was pending in Maryland district court, the United States declined to intervene in the case. On January 4, 2008, the Maryland district court granted Lockheed's motion to transfer the case to the Central District of California on forum non conveniens grounds.

On August 12, 2008, the California district court granted Lockheed's motion to dismiss with leave to amend Hooper's Second Amended Complaint, except with regard to Hooper's retaliation claim. As to that claim, the district court dismissed with prejudice, holding that the claim was barred by California's two-year statute of limitations.

On September 5, 2008, Hooper filed his Third Amended Complaint. In his Third Amended Complaint, Hooper alleges that Lockheed violated the FCA by: (1) knowingly underbidding the contract; (2) including undisclosed FOSS in software deliverables that did not convey all intellectual property rights; and (3) failing to perform all required tests or improperly conducting those tests.

On November 22, 2010, Lockheed moved for summary judgment. Lockheed also filed 52 evidentiary objections to Hooper's factual submissions in support of summary judgment. After Hooper filed a response to the motion for summary judgment and the United States filed an amicus curiae brief, the district court granted Lockheed's motion for summary judgment, ruling that (1) Hooper had not presented sufficient evidence of fraudulent underbidding to allow his claim to survive summary judgment; (2) Hooper's claims regarding FOSS are "completely unsupported"; and (3) there is "no evidence to support any fraud in the RSA IIA testing." The district court declined to reach Lockheed's argument that a fraudulent underbid or false estimate can never create liability under the FCA.

## ANALYSIS

### I.

**[1]** As noted, Hooper brings a claim under 31 U.S.C. § 3730(h), alleging that he was wrongfully discharged in retaliation for FCA-protected activity. The FCA protects

"whistle blowers" from retaliation by their employers.[3] Because § 3730(h) contains no express limitations period, the court borrows the most closely analogous state statute of limitations. *See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 422 (2005) (holding that in assessing timeliness of a FCA retaliation claim, courts should borrow the most closely analogous state limitations period). Hooper argues that the district court should have applied Maryland's three-year statute of limitations, not California's two-year statute. We review de novo the district court's determinations with respect to the statute of limitations. *Lukovsky v. City of San Francisco*, 535 F.3d 1044, 1047 (9th Cir. 2008).

## A.

Hooper properly filed his case in Maryland, where Lockheed's corporate headquarters are located. The Maryland district court granted Lockheed's motion to transfer the case to the Central District of California, on forum non conveniens grounds, under 28 U.S.C. § 1404(a).

**[2]** In *Van Dusen v. Barrack*, the Supreme Court held that after a transfer pursuant to 28 U.S.C. § 1404(a), the transferee district court generally must apply the state law that the transferor district court would have applied had the case not been moved. 376 U.S. 612, 639 (1964). Hooper argues that, under *Van Dusen*, the California district court, as the transfee court, was required to apply the law that a Maryland district court would have applied, including Maryland's statute of limitations. For the reasons set forth below, we agree that the district court erred in applying California's two-year statute of

---

[3]The FCA makes it illegal for an employer to "discharge[ ], demote[ ], suspend[ ], threaten[ ], harass[ ], or in any other manner discriminate[ ] against [an employee] in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section." 31 U.S.C. § 3730(h)(1).

limitations, rather than Maryland's three-year statute of limitations.

*Van Dusen* arose under diversity jurisdiction and the case presented to this court arose under federal question jurisdiction. *See id.* at 637-38. Still, *Van Dusen*'s analysis is not wholly inapplicable here. *Van Dusen* concluded that "[a] change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms." *Id.* at 639. The Supreme Court reasoned that to hold otherwise, "a defendant's motion to transfer could be tantamount to a motion to dismiss." *Id.* at 630. Following *Van Dusen*, the Supreme Court rendered its decision in *Ferens v. John Deere Co.*, another case that arose under diversity jurisdiction. 494 U.S. 516, 529 (1990). In *Ferens*, the Supreme Court held:

> We reasoned in *Van Dusen* that, if the law changed following a transfer initiated by the defendant, a district court "would at least be reluctant to grant transfers, despite considerations of convenience, if to do so might conceivably prejudice the claim of a plaintiff." The court, to determine the prejudice, might have to make an elaborate survey of the law, including statutes of limitations, burdens of proof, presumptions, and the like. This would turn what is supposed to be a statute for convenience of the courts into one expending extensive judicial time and resources. Because this difficult task is contrary to the purpose of the statute, in *Van Dusen* we made it unnecessary by ruling that a transfer of venue by the defendant does not result in a change of law.

*Id.* at 528-29 (citation omitted).

Circuits have diverged on the issue of whether *Van Dusen* applies to cases arising under federal question jurisdiction with embedded state law issues. In *Menowitz v. Brown*, the Second Circuit concluded that *Van Dusen* was limited to

diversity cases and that the " 'choice of a limitations period for a federal cause of action is itself a question of federal law.' " 991 F.2d 36, 41 (2d Cir. 1993) (per curiam) (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 159 n.13 (1983)); *see also Lanfear v. Home Depot, Inc.*, 536 F.3d 1217, 1223 (11th Cir. 2008); *Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1531 (11th Cir. 1984).

By contrast, in *Eckstein v. Balcor Film Investors*, the Seventh Circuit held that *Van Dusen* is not limited to diversity cases. 8 F.3d 1121, 1127 (7th Cir. 1993). The court reasoned that, "[w]hen the law of the United States is geographically non-uniform, a transferee court should use the rule of the transferor forum," including when a federal statute "leads federal courts to use state law as the basis of a federal period of limitations." *Id.* The normal rule that "each court of appeals considers the question independently and reaches its own decision," the court observed, is based on the idea that "[a] single federal law implies a national interpretation." *Id.* at 1126. When federal law is necessarily non-uniform, as when federal courts "use state law as the basis of a federal period of limitations," this justification collapses. *Id.* at 1127. In such situations, requiring federal courts to borrow the limitations periods of the transferee forum runs afoul of *Van Dusen*'s command "that a transfer under § 1404(a) accomplishes 'but a change of courtrooms.' " *Id.* (quoting *Van Dusen*, 376 U.S. at 639). Federal law is *not* "supposed to be unitary," *Menowitz*, 991 F.2d at 40, when it is borrowing limitations periods from the states, and so applying the law of the transferee forum works a real injustice, because a motion to transfer a properly filed suit can become "tantamount to a motion to dismiss." *Van Dusen*, 376 U.S. at 630.

Following *Eckstein*, in *Olcott v. Delaware Flood Co.*, the Tenth Circuit applied the appropriate limitations period from the transferor court in its sister circuit to a federal statute. 76 F.3d 1538, 1546-47 (10th Cir. 1996). The Tenth Circuit noted that this decision should not "be read to imply *Van Dusen* and

*Ferens* have any broad applicability to federal question juris-diction generally" but, nevertheless, the Tenth Circuit fol-lowed the reasoning of *Van Dusen* and *Ferens* in a federal question case to determine the appropriate borrowed statute of limitations. *Id.*; *see also In re Ford Motor Co.*, 591 F.3d 406, 413 n.15 (5th Cir. 2009) (noting that, "[a]lthough there is dis-agreement among the courts on this point, the better view is" the Seventh Circuit's in *Eckstein*).

**[3]** We now join the Fifth, Seventh, and Tenth Circuits, in holding that in a case arising under federal question jurisdic-tion, when a federal statute directs federal courts to borrow the most closely analogous state statute of limitations, a trans-feree district court must apply the state statute of limitations that the transferor district court would have applied had the case not been transferred on forum non conveniens grounds pursuant to 28 U.S.C. § 1404(a). Therefore, Maryland's three-year statute of limitations applies. Md. Cts. & Jud. Proc. Code. Ann. § 5-101. Accordingly, we remand Hooper's § 3730(h) retaliation claim to the district court so that that claim may proceed on the merits.[4]

---

[4]Neither party raised the question whether a rule other than the "forum state" rule applies in determining whether we apply Maryland's three-year statute of limitations or California's two-year statute. Both parties agree that this court applies the forum state's own statute of limitations. In dis-pute is whether the forum state is Maryland or California. In this opinion, we conclude that Maryland's three-year statute of limitations applies because (1) filing a motion to transfer under § 1404(a), forum non conve-niens, accomplishes "but a change of courtrooms," *Van Dusen*, 376 U.S. at 639, and (2) applying the law of the transferee forum (California) would work a real injustice, because motion to transfer a properly filed suit could become "tantamount to a motion to dismiss," *id.* at 630. We note that our conclusion does not address a rule other than the "forum state" rule, the rule that the parties assume applies. Thus, our opinion does not discuss whether the court applies the forum state's choice of law rules or the limi-tations period set by the state "most connected" with the federal claim, or some combination of these rules. *See United States ex rel. Ackley v. IBM*, 110 F. Supp. 2d 395, 402-03 (D. Md. 2000) (providing an illuminating discussion of these issues); *see also Chung v. Pomona Valley Cmty. Hosp.*,

## II.

In his Third Amended Complaint, Hooper asserts that Lockheed violated the FCA by submitting a fraudulently low bid, based on knowing underestimates of its costs, to improve its chances of winning the Air Force RSA IIA contract. Lockheed asserts that allegedly "false" estimates cannot be the basis for liability under the FCA, because an estimate is a type of opinion or prediction, and thus cannot be said to be a "false statement" within the meaning of the FCA. Specifically, Lockheed argues that "estimates of what costs might be in the future are based on inherently judgmental information, and a piece of purely judgmental information is not actionable as a false statement." On this issue alone, the United States filed an amicus brief, urging this court to hold that a false estimate and/or fraudulently low bid may be actionable under the FCA.[5]

## A.

[4] The FCA was enacted "during the Civil War in

---

667 F.2d 788, 791 (9th Cir. 1982) (applying the limitations period set by the state most connected with the federal claim); *Union of Flight Attendants, Local No. 1 v. Air Micronesia, Inc.*, 684 F. Supp. 1520, 1528-29 (D. Haw. 1988) (order) (applying its own two-part test incorporating both the forum state rule and the closely connected rule). Because neither Lockheed nor Hooper argued that a rule other than the "forum state" rule applies, the issue is waived. *See O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1063 (9th Cir. 2007) (holding that arguments not raised before the district court generally are waived); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) (holding that arguments not raised in a party's opening brief are generally waived).

[5]From this point forward (unless otherwise noted), we use the term "false estimate" to capture the dual concepts of "fraudulent underbidding" and "false estimates." At oral argument, the United States explained a distinction between the two. However, for purposes of this opinion, we conclude that both false estimates and fraudulent underbidding can be a source of liability under the FCA, assuming that the other elements of an FCA claim are met.

response to overcharges and other abuses by defense contractors." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). The purpose of the FCA was to "[combat] widespread fraud by government contractors who were submitting inflated invoices and shipping faulty goods to the government." *United States ex rel. Hopper v. Anton,* 91 F.3d 1261, 1265-66 (9th Cir. 1996). To this end, the FCA creates liability for any person who, *inter alia*, "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

Thus, to establish a cause of action under § 3729(a)(1)(A), the United States or relator must prove the following elements: (1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent. *United States v. Bourseau*, 531 F.3d 1159, 1171 (9th Cir. 2008); *see also United States ex rel. Cafasso v. Gen. Dyanmics C4Systems, Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011) (holding that "to commit conduct actionable under the FCA, one must, in some way, falsely assert entitlement to obtain or retain government money or property"). Likewise, to establish a cause of action under § 3729(a)(1)(B), the United States or a relator must show that defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

## B.

**[5]** Although the issue whether FCA liability may be premised on false estimates where those false estimates were knowingly made is a matter of first impression for this court, both the First and Fourth Circuits have held that FCA liability

may attach in such a situation. Their decisions rest heavily on *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943).

In *Hess*, the Supreme Court found contractors liable under the FCA for claims submitted by government contractors that the contractors obtained by collusive bidding. *Id.* at 542. Most courts have interpreted *Hess* to stand for the "fraud-in-the-inducement" theory of FCA liability. Accordingly, many courts, including this court, have applied the FCA to bid-rigging situations. *See United States ex rel Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1420 (9th Cir. 1991); *see also United States v. Gen. Dynamics Corp.*, 19 F.3d 770, 772, 775 (2d Cir. 1994) (the defendant liable for submitting inflated cost estimates in subcontract submitted for approval by the government).

The Fourth Circuit has concluded that, under a fraud-in-the-inducement theory, construing the phrase "false or fraudulent claim" broadly, FCA liability may attach where there is "fraud surrounding the efforts to obtain the contract or benefit status, or the payments thereunder." *Harrison*, 176 F.3d at 788. In *Harrison*, the relator alleged that the defendant was liable under the FCA because the defendant made several false statements in seeking government approval for a subcontract, pursuant to which the defendant subsequently made claims for payment from the government. *Id.* at 785-86. The district court expressly "rejected the possibility that [FCA] liability could rest on false statements submitted to the government to gain approval for a subcontract." *Id.* at 785. But the Fourth Circuit reversed, holding the district court's narrow interpretation of a "false or fraudulent claim" to be incorrect. *Id.* at 786.

The Fourth Circuit held that, after the 1986 amendments to the FCA, according to Congress the FCA should be broadly construed. *See id.* at 786 (quoting S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (" 'each and every claim submitted under a contract, loan guarantee,

or other agreement *which was originally obtained* by means of false statements or other corrupt or fraudulent conduct, *or in violation of any statute or applicable regulation*, constitutes a false claim' ") (emphasis added in case)). Accordingly, the court explicitly rejected the defendant's argument that the alleged false statements could not subject it to liability under the FCA "because they were only estimates." *Id.* at 792. The Fourth Circuit reasoned that "an opinion or estimate carries with it 'an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it.' " *Id.* (quoting W. Page Keeton *et al.*, *Prosser & Keeton on the Law of Torts* § 109, at 760 (5th ed. 1984)).

Similarly, the First Circuit ruled that false statements made by applicants for social security benefits were false statements within the meaning of the FCA, even if they were just an expression of the applicants' opinions, so long as the applicants knew of facts that would reasonably preclude such an opinion. *See United States ex rel. Loughren v. Unum Group*, 613 F.3d 300, 310-12 (1st Cir. 2010) (holding that, even if "the fact that an allegedly false statement constitutes the speaker's opinion," it still "may qualify as a false statement for purposes of the FCA where the speaker knows facts which would preclude such an opinion").

**[6]** As a matter of first impression, we conclude that false estimates, defined to include fraudulent underbidding in which the bid is not what the defendant actually intends to charge, can be a source of liability under the FCA, assuming that the other elements of an FCA claim (see p. 8558-59) are met.

## C.

Having determined that FCA liability may be premised on false estimates, we must now determine whether a genuine issue of material fact exists as to whether Lockheed engaged

in fraudulent underbidding. The district court concluded that Hooper failed to present sufficient evidence of fraudulent underbidding. The district court noted that Hooper relied on "extremely" limited evidence and that, even interpreting this limited evidence in the light most favorable to Hooper, none of it demonstrated that Lockheed "*knowingly* submitted a false bid to the Air Force."

On appeal, Hooper argues that (1) the district court applied the wrong legal standard; and (2) Hooper supplied sufficient information for a jury to determine that Lockheed acted knowingly in submitting a false bid. Because the district court applied the wrong legal standard and that under the correct standard, "viewing the evidence in the light most favorable to [Hooper as the] non-moving party and drawing all reasonable inferences in favor of [Hooper]," genuine issues of material fact exist, Lockheed is not entitled to judgment as a matter of law. *Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1152 (9th Cir. 2012).

**1.**

**[7]** The district court applied the wrong legal standard under the "knowledge" prong of the FCA. The district court required that Hooper demonstrate that Lockheed acted with "the intent to deceive." The FCA provides that

the terms "knowing" and "knowingly" —

(A) mean that a person, with respect to information —

(i) has actual knowledge of this information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require *no proof of specific intent to defraud*[.]

31 U.S.C. § 3729(b)(1) (emphasis added). Accordingly, the district court employed the wrong legal standard for determining FCA liability with regard to whether Hooper had established that Lockheed "knowingly" submitted a fraudulent underbid.[6]

## 2.

Construing the facts in the light most favorable to Hooper, there is a genuine issue of material fact whether Lockheed acted either knowingly, in deliberate ignorance of the truth, or in reckless disregard of the truth when it submitted its bid for the Air Force RSA IIA contract.

Hooper demonstrated that Lockheed employees were instructed to lower their bids without regard to actual cost. Mike Allen, an employee with Lockheed, testified that the Air Force did not accept Lockheed's initial bid because it was too high. Subsequently, Allen "was simply asked [by management] to change the cost" even though the change in cost was not based on any engineering judgment. Allen also testified that, in bidding on another contract, he was told to lower the cost. When Allen told his supervisors, "We can't. This is the real cost. This is what it's going to cost, if not more," he was

---

[6]Lockheed argues that the incorrect legal standard employed by the district court resulted in "harmless error." We disagree. In its final sentences regarding the fraudulent underbidding, the district court concluded that, despite Hooper's producing evidence that "might be consistent with fraudulent underbidding," he "has no evidence as to . . . [Lockheed]'s state of mind in making the bid and estimate choice that [it] did." Thus, contrary to Lockheed's argument, the district court's use of the wrong legal standard played a pivotal role in its legal analysis of the facts and did not result in "harmless error."

dismissed from the bidding contract meeting. Allen later learned that Lockheed lowered the cost by almost half and was awarded the contract. He also testified that Lockheed was dishonest in the productivity rates that it used to determine the cost for a contract.

Further, in the Air Force memorandum analysis of Lockheed's bid, the Air Force noted that Lockheed was "optimistic about some of its inputs . . . , resulting in an overstated potential for cost savings." Additionally, the Air Force stated that it found Lockheed's Risk Analysis to be "unrealistic . . . , so the total risk is understated." On the other hand, the Air Force stated that "[o]verall, [Lockheed] was found 'realistic' for this factor." The memorandum found that Lockheed's bid provided the best overall value, even if it was possible that there were risks which might "lead to cost growth beyond target cost."

**[8]** Because there is a genuine issue as to whether Lockheed had actual knowledge, deliberately ignored the truth, or acted in reckless disregard of the truth when it submitted its allegedly false bid for the RSA IIA contract, we reverse and remand to the district court. *See Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc) (when reviewing a district court's grant of summary judgment, this court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial).[7]

### III.

In addition to his claims of retaliation and fraudulent underbidding, Hooper alleges that Lockheed fraudulently used freeware and employed defective testing procedures. The district

---

[7]Responding to Hooper's argument that the district court applied the wrong legal standard to the FCA's knowledge requirement, 31 U.S.C. § 3729(b), Lockheed suggests that this error was harmless. We decline to reach this issue at this stage.

court dismissed these claims in its order granting summary judgment. We affirm.

With regard to the freeware, the district court concluded that: (1) Hooper had "no apparent foundation" and provided "no evidence" to support his argument that the same code used in the identified FOSS, which was submitted three days after Hooper's opposition was due, was the same code as that in the RSA IIA software; (2) Hooper failed to identify any requirement that FOSS be disclosed at any particular time; and (3) it was "undisputed" that Lockheed was allowed to use FOSS. Moreover, the court noted that Air Force personnel responsible for oversight of the RSA IIA project testified that there is no requirement that FOSS be disclosed.

With regard to fraudulent testing, the district court similarly found Hooper's claim to be unsupported. The district court concluded that there was no evidence of fraud in the testing because the Air Force was aware of and approved Lockheed's testing methods, even if the tests were not done in the order specified in the contracts.

**[9]** After the 1986 amendments to the FCA, "government knowledge is no longer an automatic bar to suit, [and as a result,] courts have had to decide case by case whether a FCA claim based on information in the government's possession can succeed." *United States ex rel. Butler v. Hughes Helicopters, Inc.,* 71 F.3d 321, 326 (9th Cir. 1995). Although the government's "knowledge of the underlying facts is not automatically a complete defense when that knowledge appears only as an allegation on the face of a complaint under the FCA, . . . *Hagood* left open the possibility that at the summary judgment stage or after trial, the extent and the nature of government knowledge may show that the defendant did not 'knowingly' submit a false claim and so did not have the intent required by the post-1986 FCA." *Id.* at 327 (citing *Hagood*, 929 F.2d at 1418-19, 1421). Based on the facts before the court, the court held that it "must affirm the

directed verdict." *Id.*; *see also Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) (holding that because the defendant had shared with the Army all of the mistakes and limitations that later became the subject of Wang's FCA allegations, Wang had not produced the required evidence of intent).

**[10]** The same reasoning applies here, where Lockheed submitted overwhelming evidence that it shared with the Air Force in its Disclosure Letters the use of FOSS and also disclosed to the Air Force its testing procedures. Accordingly, Hooper's claims fail because he has failed to demonstrate the existence of a genuine issue of material fact as to whether Lockheed "knowingly" submitted a false claim.

## IV.

Hooper contends that the district court erred in excluding (A) several documents; (B) the deposition transcript of Lockheed employee Greg Braun; and (C) an expert witness report. "The district court's exclusion of evidence in a summary judgment motion is reviewed for an abuse of discretion." *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002).

## A.

**[11]** Hooper contends that the district court erred in excluding documents obtained during discovery. Without a discussion of any specific piece of evidence and without citing any cases, Hooper generally asserts that "[a]ll of the documents Hooper produced were obtained by him while he was at Lockheed and were either 'a report or e-mail where there is some indication that the subject matter is within the scope of the writer's normal duties' " and that "[m]any of these documents were also produced by Lockheed to Hooper." It is entirely unclear which specific pieces of evidence Hooper is referring to and it is equally unclear on what legal basis(es) he believes the document(s) should be admitted. As the party

seeking admission of these documents, Hooper bears "the burden of proof to show [their] admissibility." *Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*, 627 F.3d 376, 385 (9th Cir. 2010). Here, "[g]iven the overwhelming volume of documents before the district court, once Defendants objected to the evidence Plaintiff[ ] sought to be admitted, the onus was on Plaintiff[ ] to direct the district court's attention to . . . evidentiary principles under which the evidence in question could be deemed admissible." *Id.* at 385-86. Hooper failed to direct the district court's attention to any evidentiary principle and has also failed to do so on appeal. Accordingly, the district court was within its discretion to exclude these documents.

### B.

**[12]** Hooper's opposition to Lockheed's motion for summary judgment was due on December 13, 2010. On December 29, 2010, Hooper deposed Lockheed employee Braun. On January 7, 2011, at around 6:00 p.m., less than three days before the hearing on Lockheed's motion for summary judgment, Hooper filed the deposition transcript of Braun and other exhibits. The district court refused to consider the Braun deposition transcript and the other exhibits submitted on January 7, 2011, because it found the transcript and exhibits to be untimely. The district court's decision was not an abuse of discretion. Excluding a deposition transcript filed less than three days before a hearing and long past the deadline for submitting such materials is within the discretion of the district court. *See Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1226 (9th Cir. 2005) (finding no abuse of discretion to exclude a declaration when deadline for the summary judgment opposition lapsed forty-seven days earlier).

### C.

Dr. Lewis Gray is an expert with specialized knowledge of MIL-STD 498, which is allegedly the standard requirement

regarding software used in government contracts. Dr. Gray participated in the creation of MIL-STD 498 and taught classes on compliance with the standard. He has also written articles and a handbook on the application of MIL-STD 498.

Dr. Gray drafted a report at the request of Hooper. According to Dr. Gray, under the RSA IIA contract, Lockheed's performance was governed in large part by MIL-STD 498. Therefore, Dr. Gray's report focuses on Lockheed's performance under the MIL-STD 498 standard.

The district court refused to consider Dr. Gray's report because (1) the opinions were improper legal conclusions and (2) Dr. Gray lacked personal knowledge to lay the proper foundation for the report. Specifically, the court concluded that Dr. Gray's "expert opinion consists entirely of improper legal conclusions and opinions regarding government regulations and policies."

Under Federal Rule of Evidence 702, matters of law are inappropriate subjects for expert testimony. Hooper contends, however, that the district court abused its discretion in excluding Dr. Gray's report because the case falls under the exception to the general rule: in "highly complex and technical" cases, a trial judge may permit some testimony at variance with the general rule. Specifically, Hooper contends that the expert report was necessary "to determine whether Lockheed's performance under the contract did in fact violate the requirements of MIL-STD 498." Hooper asserts that this is a "complex question, which cannot be easily answered without the assistance of an expert."

Hooper relies in large part on *Flores v. Arizona*, 516 F.3d 1140 (9th Cir. 2008), *reversed on other grounds by Horne v. Flores*, 557 U.S. 433 (2009). *Flores* held that, although "[i]t is true that matters of law are generally inappropriate subjects for expert testimony, . . . there may be instances in rare, highly complex and technical matters where a trial judge, uti-

lizing limited and controlled mechanisms, and as a matter of trial management, permits some testimony seemingly at variance with the general rule." *Id.* at 1166 (internal quotation marks and citation omitted). That case, however, does not hold that a district court is *required* to accept such expert testimony. To the contrary, in *Flores* the district court *permitted* the expert testimony, and we upheld its decision. Contrary to Hooper's urging, *Flores* does not stand for the proposition that a district court must accept such expert testimony.

**[13]** In fact, "even if [expert] testimony may assist the trier of fact, the trial court has broad discretion to admit or exclude it." *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 842 (9th Cir. 1995) (per curiam) (internal quotation marks omitted). Here, the trial court was in the best position to determine whether Dr. Gray's report would be helpful to its analysis. *Id.* Accordingly, we affirm the district court on this issue.

## CONCLUSION

We affirm in part and reverse and remand in part. We AFFIRM the district court's conclusion that Hooper failed to establish his claims of fraudulent use of FOSS and defective testing procedures because there is no genuine issue of material fact as to whether Lockheed 'knowingly' submitted a false claim.

We also AFFIRM the district court's evidentiary rulings.

We REVERSE and REMAND the district court's dismissal of Hooper's wrongful discharge claim under 31 U.S.C. § 3730(h) as barred by California's two-year statute of limitations. We hold that in a case arising under federal question jurisdiction, when a federal statute directs federal courts to borrow the most closely analogous state statute of limitations, a transferee district court must apply the state statute of limitations that the transferor district court would have applied had the case not been moved on forum non conveniens

grounds pursuant to 28 U.S.C. § 1404(a). Therefore, Maryland's three-year statute of limitations applies here.

We also REVERSE and REMAND the district court's dismissal of Hooper's claim that Lockheed violated the FCA by knowingly underbidding the contract. Having determined that FCA liability may be premised on false estimates, we hold that there is a genuine issue of material fact whether Lockheed acted either knowingly, in deliberate ignorance of the truth, or in reckless disregard of the truth when it submitted its bid for the Air Force RSA IIA contract.

The parties shall bear their own costs of appeal.